

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

ING GLOBAL,

        *Plaintiff,*

    v.

UNITED PARCEL SERVICE OASIS
SUPPLY CORPORATION; BONE
SAFETY SIGNS, LLC; DOUG
VOLLENWEIDER; MICHAEL ROSE; and
JAMES THOMPSON,

        *Defendants.*

Case No. _____

**COMPLAINT**

---

       Plaintiff ING Global ("ING" or "Plaintiff") for its complaint against Defendants United

Parcel Service Oasis Supply Corporation ("UPS"), Bone Safety Signs, LLC ("Bone Safety"),

Doug Vollenweider ("Vollenweider"), Michael Rose ("Rose"), and James Thompson

("Thompson") (UPS, Bone Safety, Vollenweider, Rose, and Thompson are collectively referred

to herein as the "Defendants" and Vollenweider, Rose, and Thompson are collectively referred to

herein as the "Individual Defendants") alleges as follows:

**PARTIES**

       1.    Plaintiff ING Global is a New York corporation with its principal place of

business in New York.

       2.    Defendant UPS is a Delaware corporation with its principal place of business in

Atlanta, Georgia.

       3.    Defendant Bone Safety is a limited liability company organized under the laws of

the State of Georgia with its principal place of business in the State of Georgia.  Upon

information and belief, no member of Bone Safety is a citizen or resident of the State of New

York.

1

4.     Defendant Vollenweider is a resident and citizen of the State of Georgia.  At all times relevant herein, Defendant Vollenweider was an authorized employee, agent, and representative of UPS acting within the scope of his employment and/or agency.  Defendant Vollenweider represented to Plaintiff that he was affiliated with UPS Procurement Services and had decision-making authority within that organization and/or division of UPS.

5.     Defendant Rose is a resident and citizen of the State of Georgia.  At all times relevant herein, Defendant Rose was an authorized employee, agent, and representative of UPS acting within the scope of his employment and/or agency.  Defendant Rose represented to Plaintiff that he was affiliated with UPS Corporate Procurement and had decision-making authority within that organization and/or division of UPS.

6.     Defendant Thompson is a resident and citizen of the State of Georgia.  At all times relevant herein, Defendant Thompson was an authorized employee, agent, and representative of UPS acting within the scope of his employment and/or agency.  Defendant Thompson represented to Plaintiff that he was a manager and/or vice president of UPS's Corporate Procurement Group and had decision-making authority within that organization and/or division of UPS.

**JURISDICTION AND VENUE**

7.     Plaintiff incorporates paragraphs 1 through 6 of this Complaint as if fully set forth herein.

8.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because it is between citizens of different States, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because: (i) a substantial part of the events material to Plaintiffs' causes of action occurred in this District, and (ii) all Defendants are subject to personal jurisdiction in this District at the time this action is commenced.

10.     The Defendants are subject to personal jurisdiction in this District because: (i) Defendants UPS and Bone Safety continuously and systematically do business in the State of New York and derive substantial revenue from this State; (ii) the Defendants have purposefully directed their wrongful activities at the State of New York and have caused substantial harm within this State; (iii) the effects of the Defendants' wrongful conduct have been felt in the State of New York, as further alleged in this Complaint; (iv) the Defendants' conduct made the State of New York the focal point of their breaches of contractual and legal duties owed to Plaintiff; and/or (v) the Defendants' wrongful conduct, as more fully set forth in this Complaint, was intentionally and expressly aimed at the State of New York.

## FACTS COMMON TO ALL COUNTS

11.     Plaintiff incorporates paragraphs 1 through 10 of this Complaint as if fully set forth herein.

12.     Plaintiff ING is a woman-owned, global manufacturer, importer, and distributor of various products, including bags used for the purpose of transmitting parcels around the world.

### I.
### Background to the ING-UPS Relationship

13.     United Parcel Service promotes itself as a multi-billion-dollar corporation that focuses on the goal of enabling commerce around the globe. United Parcel Service advertises itself as a global company with one of the most recognized and admired brands in the world.

United Parcel Service claims to be the world's largest package delivery company and a leading global provider of specialized transportation and logistics services. United Parcel Service states that it manages the flow of goods, funds, and information in more than 200 countries and territories worldwide.

14.     Defendant UPS, among other things, supplies bags to United Parcel Service's operations in the United States and around the world. The bags—commonly referred to as Reusable Network Containers ("RNCs")—are either newly manufactured or used bags that have been identified by UPS as repairable and available post-repair for re-use by United Parcel Service's operations.

15.     The RNCs are critical to United Parcel Service's operations in the United States and around the world because parcels are sorted through the use of the RNCs and thereafter tracked to ensure proper and timely delivery. According to Defendant UPS, it uses the RNC internally to consolidate numerous small packages into one bag to reduce the number of handlings in the UPS sorting and transportation system. The RNCs increase UPS's productivity and speed in their operations in the United States and around the world. The RNCs can be found in all aspects of United Parcel Service's business—in trucks, warehouses, and in their corporate headquarters.

16.     Among other things, the Individual Defendants are responsible for ensuring that United Parcel Service's worldwide operations are supplied with a sufficient number of bags, whether they be new or repaired RNCs. The Individual Defendants are also responsible for the bid and contracting process necessary to procure new and repaired RNCs for United Parcel Service's worldwide operations. Defendant Thompson supervises Defendant Rose, who in turn supervises Defendant Vollenweider.

17.     Prior to 2010, Defendant UPS entered into one-year contracts with new and repaired RNC suppliers.  Beginning in 2007, Plaintiff entered into one-year contracts with Defendant UPS for the supply of new RNCs. For the years 2007-2009, Plaintiff ING operated as a second or third-tier supplier of new RNCs to Defendant UPS.  In those years, Plaintiff ING did not supply Defendant UPS with repaired RNCs.

18.     During the 2007-2009 period, ING's relationship with Defendant UPS was governed by a series of annual price schedules and a Master Purchase of Goods Agreement dated July 1, 2007 (the "2007 Master Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1** and incorporated herein by reference.

19.     In 2007, Defendant UPS asked Plaintiff to supply it with 200,000 new RNCs pursuant to two price schedules, the first of which was executed at the end of June 2007 and the second at the end of October 2007 (the "2007 Price Schedules").  A true and correct copy of the 2007 Price Schedules is attached hereto as **Exhibit 2** and incorporated herein by reference.

20.     The 2007 Price Schedules also provided that Defendant UPS "at its discretion may request an increase above" 100,000 new RNCs.  According to the 2007 Price Schedules, if UPS asked Plaintiff ING to supply more than 100,000 new RNCs, ING was required to "negotiate new pricing."  And that is exactly what occurred.  In October 2007, Defendant UPS ordered an additional 100,000 new RNCs from Plaintiff, but at a lower price than the first 100,000 RNCs that were subject to the June 2007 price schedule.

21.     In 2008, Defendant UPS asked Plaintiff to supply it with 200,000 new RNCs pursuant to a price schedule executed at the end of October 2008 (the "2008 Price Schedule").  A true and correct copy of the 2008 Price Schedule is attached hereto as **Exhibit 3** and incorporated herein by reference.  As in 2007, in 2008, Defendant UPS had the "discretion" to request "an

increase" in new RNCs above the 200,000 specified in the 2008 Price Schedule. However, unlike the 2007 Price Schedules, the 2008 Price Schedule did not require Plaintiff ING to negotiate new pricing if Defendant UPS asked ING to supply more than 200,000 new RNCs.

22.     In 2009, Defendant UPS asked Plaintiff to supply it with 100,000 new RNCs pursuant to a Price Schedule executed at the end of September/beginning of October 2009 (the "2009 Price Schedule"). A true and correct copy of the 2009 Price Schedule is attached hereto as **Exhibit 4** and incorporated herein by reference. As with prior years, Defendant UPS had the discretion to request more than 100,000 new RNCs from Plaintiff ING. And, like 2008, Plaintiff ING was not required to negotiate new pricing if Defendant UPS required ING to supply more than 100,000 new RNCs.

23.     During the 2007-2009 period, Defendant UPS required approximately 800,000 to 1 million new RNCs per year. For those years, Plaintiff ING's commitment to the price specified in the price schedules lasted one year, except that in 2007 the price for new RNCs was required to be re-negotiated if Defendant UPS asked Plaintiff ING to supply it more than 100,000 bags.

24.     While Plaintiff ING was a second- or third-tier supplier during 2007-2009, Defendant UPS gave the majority of its new and all of its repair RNC business to Defendant Bone Safety, a company that manufactures and sells signs and sign accessories. Defendant Bone Safety was Defendant UPS's primary supplier between 2007-2009. With respect to new RNCs, Defendant Bone Safety manufactured those bags in China. With respect to repaired RNCs, those too were repaired in China, but were shipped into China from Defendant Bone Safety's facility in the United States.

25.     During the 2007-2009 period, Defendant Bone Safety received 100% of the RNC repair business and a majority (approximately 70%-80%) of Defendant UPS's new RNC business.

26.     According to a person working for UPS's operations in China, Defendant Bone Safety was able to import used RNCs into China for repair only through a "special relationship" between Defendant Bone Safety and customs in Ningbo, China (the then-port of destination for UPS's to-be-repaired RNCs).   According to a person knowledgeable about Defendant Bone Safety's operations in China, Bone Safety was permitted to import damaged RNCs into China only through an "under [the] table" (*i.e.*, improper) relationship with Ningbo customs.   This knowledgeable person stated that "[w]e [at] UPS would never consider doing a thing like this." Several months after Plaintiff ING entered into the 2010 contract with Defendant UPS, Plaintiff learned for the first time that, in July or August 2009, Chinese authorities made it illegal to import used UPS bags into China.

27.     During the 2007-2010 period, the bidding process for RNCs was run primarily by Defendant Vollenweider, who was supervised by Defendants Rose and Thompson.   At all relevant times herein, Defendant Vollenweider maintained a long-time personal friendship with high-level contacts at Defendant Bone Safety.   At all times relevant herein, the Defendant UPS and the Individual Defendants were fully aware of the under-the-table relationship between Defendant Bone Safety and Ningbo customs.   Despite that awareness, neither Defendant UPS nor the Individual Defendants took any steps to stop Defendant Bone Safety from improperly importing to-be-repaired bags into China.

## II.
## The 2010 Bidding Process for New and Repaired RNCs

28.     Between 2007 and 2010, Plaintiff was repeatedly commended for the quality and timely delivery of new RNCs to Defendant UPS.

29.     Based on Plaintiff's prior performance and status as an existing RNC supplier for Defendant UPS, the Defendants in 2010 encouraged and invited Plaintiff to bid on Defendant UPS's contract for new and repair RNCs. Defendant Bone Safety was also invited to submit a bid, as were at least two other RNC suppliers.

30.     Unlike in previous years, in 2010, Defendant UPS decided to enter into a longer-term relationship with an RNC supplier. According to Defendant Rose, the annual RNC procurement process was time-consuming and inefficient. According to Defendants Thompson and Rose, Defendant UPS's RNC needs would be better served with a fixed-price RNC contract that exceeded one year. In an email to Plaintiff ING, Defendant Rose stated: "The bottom line...UPS is seeking the best option for a multi-year award. If we are unable to identify an appropriate value for a multi-year award, then the award will revert to a single year award, with a bid to be performed each year thereafter."

31.     Defendant UPS represented to Plaintiff that the intent of 2010 competitive bidding process for RNCs included:  reducing product, transportation, and fright costs; evaluating global sourcing opportunities; establishing worldwide product quality, consistency; and providing opportunities for minority and women-owned companies like Plaintiff ING.

32.     Defendant UPS further represented to Plaintiff that the anticipated outcome of the bidding process would be a contract for a minimum of one year with one or more suppliers. A multiple year contract was to be considered with the expectation that the committed extended term would allow the successful supplier(s) to offer additional cost savings and allow an

opportunity for UPS and the supplier to evaluate the marketplace with respect to product specification and functionality.

33.     The 2010 RNC contract was intended to be awarded through a bidding process that was not open to the public but was only available to suppliers approved by the Defendants. Although Defendant Vollenweider was in charge of the prior bid process for RNCs during the 2007-2009 period, in 2010, Defendant Vollenweider was out on leave. As a result, Defendant Rose conducted the 2010 bidding process for UPS's procurement of new and to-be-repaired RNCs.

34.     Prior to 2010, the RNC repair program was never put out for bid; only the new RNC program was subject to competitive bidding. Defendant Bone Safety was awarded the repair RNC program every year between 2007-2009 because of that company's close relationship with Defendant Vollenweider, who claimed (incorrectly) that only Defendant Bone Safety had the ability to effectively run the RNC repair program for Defendant UPS. Defendant Rose changed that prior practice in 2010 and opened up both programs to competitive bidding.

35.     In March 2010, the Defendant UPS sent Plaintiff ING a username and password that enabled ING to access the 2010 bid form from a secure UPS-hosted website. Defendant UPS deemed the bids to be confidential and represented to Plaintiff that it would exercise reasonable care to limit access to those who have a need to know. Not long after submitting its bid, Plaintiff ING was informed by the Defendants that it had won the contract to be the primary supplier of new and repaired RNCs to UPS. Plaintiff ING's victory was short-lived, however.

36.     Having lost its long-held position as primary RNC supplier for Defendant UPS, Defendant Bone Safety complained to Defendant Rose that it wanted another opportunity to bid on the new and repair RNC program. According to Defendant Rose, Defendant Bone Safety was

upset at not having the majority of the new RNC business and the entirety of the repair business and it wanted a second shot at underbidding Plaintiff ING.

37.     Rather than respect and confirm the results of the first bid process and award Plaintiff ING the contract as primary supplier of new and repaired RNCs, the Defendants decided to give Defendant Bone Safety a second chance.  Accordingly, Defendant UPS, through Defendants Rose and Thompson, invalidated the results of the competitive bid process. Defendants Rose and/or Thompson disclosed to Defendant Bone Safety the material terms of the bids submitted by Plaintiff ING, contrary to the confidentiality protections that Defendant UPS promised to Plaintiff.

38.     Nothing in the 2010 Bid Form or the accompanying request for proposals ("RFP") (a) permitted Defendant UPS to deprive Plaintiff ING of its legitimate victory in the bidding process, or (b) stated, explicitly or implicitly, that the bid process would include more than one round of bidding.  Rather than halt or otherwise delay the bidding process, Plaintiff ING had no choice other than to agree to Defendant UPS's demand that ING relinquish its win and participate in a re-do of the bidding process for the new and repair RNC business.

39.     Because Plaintiff ING was forced by UPS to forego the results of the first competitive bidding process, Defendant UPS required all prospective bidders to submit new bids. Plaintiff ING did so and lowered its original price bids for the repair and new RNC business by approximately 20%-30%.

40.     Using the required login information, on or about April 21, 2010, Plaintiff ING obtained an RNC Bid Form (the "2010 Bid Form"), a true and correct copy of which is attached hereto as **Exhibit 5** and is incorporated herein by reference.  Defendant UPS and the Individual Defendants were aware of the contents of the 2010 Bid Form.

41.     In relevant part, the 2010 Bid Form provided Plaintiff and other prospective RNC bidders the following material information:

(a)     the "[e]stimated" number of bags needed for 2010 equaled 925,000;

(b)     the "[p]roject[ed]" number of bags needed for 2011 and 2012 was 400,000 per year;

(c)     under the heading "2011 and 2012 Delivery Schedule," Defendant UPS represented to Plaintiff and other RNC bidders that "[t]he annual volume requirement will be identified in advance of each calendar year, to allow for development of an appropriate delivery schedule to commence the month following the previous years['] order";

(d)     under the heading "Award Split," Defendant UPS represented to Plaintiff and other RNC bidders that "[d]ue to risk mitigation and long lead times, UPS anticipates making a split award between either 2 or 3 suppliers. *The intent is to identify a 'primary supplier,' to whom will be awarded at least 50% of the volume as well as the repair program. The remaining volume will be awarded to either a single supplier, or split between 2 suppliers ('secondary supplier(s)')*" (emphasis added);

(e)     under the heading "Continuous Delivery," Defendant UPS represented to Plaintiff and other prospective RNC bidders that "[t]he annual volume requirement will be identified in advance of each calendar year, to allow for development of an appropriate delivery schedule to commence the month following the previous years['] order. *The intent will be to have deliveries of the awarded annual amount spread out over the calendar year*" (emphasis added);

(f)     under the heading "Product Pricing," Defendant UPS represented to Plaintiff and other prospective RNC bidders that they were to submit pricing proposals "for all 3 years" to "ensure a proper analysis"; and

(g)     in the portion of the 2010 Bid Form that dealt with proposals for the repair of RNCs, Defendant UPS reiterated its "intent" to "identify a 'primary supplier,' to whom will be awarded at least 50% of the volume as well as the repair program" and to award the "remaining volume" of new RNCs to one or two other suppliers.

42.     On or about April 29, 2010, Plaintiff ING submitted bids for the new and repair RNC program.  In preparing its bids for both programs, Plaintiff ING relied on, among other things: Defendant UPS's prior volume (between 2007-2009) of new RNCs (800,000 to 1 million per year); the fact that UPS's prior primary supplier received a majority of the new RNC business, which in practice equaled approximately 70%-80% of UPS's requirements; and, the representation in the 2010 Bid Form that the primary supplier would win the entire repair program and "at least 50%" of the new RNCs.

43.     The Individual Defendants similarly represented to Plaintiff ING that (a) the primary supplier would be awarded a majority of the new RNC orders for each year that the supplier also supplied Defendant UPS repaired RNCs; (b) because of economies of scale and other issues, a "majority" of new RNCs would consist of approximately 70%-80% of UPS's requirements for new RNCs; and, (c) the bids for new and repaired RNCs would be considered as a whole to determine the best overall value for Defendant UPS.

44.     Prior to submitting its April 2010 bid, Plaintiff ING had numerous discussions with Defendants Vollenweider and Rose about the bidding process, Defendant UPS's requirements, and the parties' respective expectations in the event that ING became UPS's

primary supplier of new and repaired RNCs.  The Individual Defendants were fully aware that Plaintiff ING relied on their representations and those in the 2010 Bid Form when calculating and submitting its RNC proposals to Defendant UPS.  The Individual Defendants were fully aware that their representations and those in the 2010 Bid Form were material to Plaintiff ING's decision to submit the bids that it did for UPS's 2010 new and repair RNC program.

45.     After receiving the bids, Defendant UPS used an in-house computer program to aid its determination of which bid presented UPS the best value.  That program analyzed as a unified whole pricing and other information concerning bids for the new *and* repaired RNCs. Based on the Defendants' representations and those made in the 2010 Bid Form, Defendant UPS's assessment of best overall value for the company assumed that a primary supplier would be chosen and that that supplier would receive at least a majority of UPS's requirements for new RNCs and the entire repair program.

### III.
### ING Becomes UPS's Primary Supplier of New and Repaired RNCs

46.     Despite the irregularities in the 2010 bidding process, Plaintiff ING ultimately was awarded the contract to be Defendant UPS's primary supplier of new and repaired RNCs for three years (*i.e.*, 2010-2012).  Plaintiff's contract as primary supplier of RNCs for Defendant UPS was memorialized in two documents.  First, the parties entered into a new Master Purchase of Goods Agreement (dated May 3, 2010) (hereinafter, the "2010 Master Agreement"), which replaced the 2007 Master Agreement that governed Plaintiff's role as second- or third-tier RNC supplier.  A true and correct copy of the 2010 Master Agreement is attached hereto as **Exhibit 6** and is incorporated herein by reference.  Second, the parties executed a Price Schedule (dated May 3, 2010) (hereinafter, the "2010 Price Schedule"), a copy of which is attached hereto as **Exhibit 7** and is incorporated herein by reference.  The 2010 Bid Form, the 2010 Master

Agreement, and the 2010 Price Schedule are collectively referred to herein as the "2010 Primary Supplier Contract" or the "Contract."

47.   The material terms of the 2010 Primary Supplier Contract were consistent with the 2010 Bid Form and the representations made by the Defendants to Plaintiff ING, as follows:

(a)   the Contract was for a fixed term of three years and for a fixed price on both new and repaired RNCs, with the contract setting out a specific set of circumstances that allowed changes to the price for new and repaired RNCs (2010 Master Agreement, §§ 1, 3; 2010 Price Schedule, "Quantity" & "Pricing Terms" & Exh. E);

(b)   under the heading "Award Consideration," the 2010 Price Schedule states that "[t]he award of the Repairs aligns with the supplier receiving a majority of the orders for new RNCs";

(c)   for 2010, Defendant UPS estimated that it would require 740,000 new RNCs, and that "[a]ny quantity above 740,000 will be considered as an order placed against the Year 2 [2011] volume";

(d)   Defendant UPS did not have an accurate estimate of its 2011 and 2012 requirements (because the 2010 Primary Supplier Contract was entered into in May 2010), and UPS therefore estimated that it would require 230,000 new RNCs for each of those two years;

(e)   Defendant UPS estimated that, for the period 2010-2012, they would require 1.2 million new RNCs, that it had the "discretion" to "adjust the quantity stated herein," and that "*[a]dditional quantities will be purchased at the identified pricing in [the 2010 Price Schedule]*" (emphasis added);

(f)     the Contract specified the process for changing the pricing of new and repaired RNCs: "All identified prices . . . shall remain in effect throughout the life of [the 2010 Price Schedule] unless both parties agree to adjust such prices to reflect volume discounts, raw material price increase/decrease for resin, currency rate fluctuations, or such other reasons as the parties may identify";

(g)     the Contract also specified the timing of any change to new RNC price in the event that the parties identified reasons that justified a price change:  "Price adjustments shall only be considered annually when the Delivery Schedule is provided to [Plaintiff ING] by [Defendant UPS]" (original emphasis);

(h)     with regard to price changes to new RNCs, the Contract specified that "[a]djustments [to price] will be based on applicable indexes as of the date the Delivery Schedule is provided to [Plaintiff ING] as compared to a baseline established on May 30, 2010";

(i)     with regard to price reductions for repair RNCs, the Contract permitted such reductions only if UPS "handle[d] the transportation of the repair bags from the UPS location to the [ING]-directed port, and then back to the appropriate UPS location";

(j)     the Contract prescribed a delivery schedule for 2010, requiring Plaintiff ING to deliver all 740,000 units to the "port of export" (i.e., Ningbo, China) by October 29, 2010;

(k)     the Contract also prescribed a delivery schedule for 2011 and 2012, representing that "[i]n advance" of those years, Defendant UPS "will provide [Plaintiff ING] the requested quantities and Delivery Schedule";

(*l*)   with respect to the volume of repairs, the Contract stated that "UPS has experienced an average annual Repair quantity of approximately 125,000" and that "[t]his information is for historical reference only and does not constitute a guarantee or commitment of future Repair quantities" (original emphasis);

(m)   the Contract required Plaintiff ING to "maintain an[] inventory of repair material so as not to interrupt the flow of repaired product"; and

(n)   the Contract required Plaintiff ING to "make every reasonable effort to process the Repairs in as efficient, effective and timely manner as possible, with an anticipated turn around of thirty (30) days . . . ."

48.   In 2010, Defendant UPS asked Plaintiff ING to fill thirty-four (34) orders for new RNCs between June 15 and November 2, 2010, for a total volume of 744,000 RNCs. A true and correct copy of the invoices for the 2010 orders is attached hereto as **Exhibit 8**. However, even though Plaintiff ING was awarded 100% of Defendant UPS's repair business, ING received none of the repair business in 2010.

49.   In 2011, Defendant UPS asked Plaintiff ING to fill only ten (10) orders for new RNCs and only for two weeks in January (January 10-24), for a total volume of 230,100 RNCs. A true and correct copy of the invoices for the 2011 orders is attached hereto as **Exhibit 9**. Plaintiff ING has received no additional orders for new RNCs for the year 2011.

50.   As they had in the past, with respect to Plaintiff ING's performance of its Contract obligations during 2010 and 2011, Defendant UPS and the Individual Defendants repeatedly stated to Plaintiff ING that its work product and adherence to the prescribed delivery schedules were unmatched by other suppliers.

51.     Indeed, with respect to the 740,000 new RNCs timely delivered by Plaintiff ING, Defendant UPS and the Individual Defendants represented to Plaintiff that they were being pressured to deliver such a high volume of bags in just a few months, and that the 740,000 were considered to be a "special delivery."  When Plaintiff ING met Defendant UPS's objectives to supply the 740,000 RNCs by the end of October 2010, Defendant UPS and the Individual Defendants thanked and praised Plaintiff for its work.

## IV.
## Serious Problems with the RNC Repair Program; Plaintiff ING
## Provides a Solution that is Accepted by UPS

52.     Despite being awarded 100% of the repair program, Defendant UPS did not provide Plaintiff ING any of the repair business in 2010.  After being awarded the Contract in May 2010, Plaintiff repeatedly asked the Individual Defendants and the person in charge of Defendant UPS's storage facility in Illinois (Don Miller) when the RNCs in need of repair would be provided to Plaintiff.  The Individual Defendants, on behalf of Defendant UPS, represented to Plaintiff that the to-be-repaired RNCs would be forthcoming.  This was a misrepresentation and the Individual Defendants knew it because they continued to provide Defendant Bone Safety the RNC repair business after May 3, 2010.

53.     At the same time, immediately after being awarded the repair program, Plaintiff ING began the process of establishing operations in China to handle the import and repair of damaged UPS bags.  However, in the fall of 2010, Plaintiff ING learned for the first time that Defendant Bone Safety was illegally importing damaged RNCs into China, that such importation was allowed by virtue of an "under [the] table" (i.e., improper) relationship between Bone Safety and Ningbo customs, and that the Chinese authorities would not permit Plaintiff ING to import

damaged RNCs into China.  The Chinese authorities informed ING over the phone and in writing

that they considered such goods to be hazardous materials (i.e., solid waste).

54.     After being told by the Chinese authorities that importing damaged RNCs into

China was not permissible and illegal, Plaintiff ING brought this to the attention of Defendant

UPS and the Individual Defendants.   The Individual Defendants became very angry with

Plaintiff and threatened to terminate the Contract if ING continued to say that Defendant UPS's

supplier (Defendant Bone Safety) was engaged in illegal activity.  Plaintiff ING stated to the

Individual Defendants in clear and unmistakable terms that it would never operate illegally in

China and that it would never enter into any "under the table" relationship with Chinese customs

or its agents.

55.     Even though Plaintiff ING could not conduct repairs in China and even though

ING's pricing for the repair program assumed that repairs would be made in China, ING insisted

on working with Defendant UPS and the Individual Defendants on finding a solution to the

problem.  Plaintiff spent significant funds in connection with finding a new location to import

damaged RNCs for repair.  ING looked at establishing a facility in Mexico, Canada, Thailand,

South Africa, Vietnam, Cambodia, Egypt, and Hong Kong.

56.     Plaintiff ING eventually established a facility in Hong Kong.   To facilitate

Defendant UPS's RNC repair business, Plaintiff, among other things:  entered into a lease for

space to run the repair operation; hired labor; purchased machinery; and trained workers.

Plaintiff ING spent at least approximately $1 million to set up the Hong Kong factory for

Defendant UPS's RNC repair business.

57.     ING spent this money to, among other reasons, make the UPS-ING relationship

stronger and longer lasting.  The Individual Defendants were under a tremendous amount of

pressure to find a way of moving the growing number of containers that housed to-be-repaired RNCs at UPS's facility in Illinois. Defendant UPS and the Individual Defendants checked with other vendors to see if they had a viable solution to their problem, but none of those vendors had one. Plaintiff ING is the company that provided the solution to Defendant UPS's and the Individual Defendants' problem.

58.     At all times relevant herein, Defendant UPS and the Individual Defendants knew, approved, encouraged, and aggressively pushed Plaintiff to find an alternative location for carrying on UPS's RNC repair business. At all times relevant herein, Defendant UPS and the Individual Defendants knew that Plaintiff ING was spending significant funds to ensure that UPS's RNC repair program would continue with minimal disruption. Accordingly, on April 15, 2011, Defendant UPS and Plaintiff ING entered into Price Schedule #2 (hereinafter, the "2011 Price Schedule"), a true and correct copy of which is attached hereto as **Exhibit 10** and incorporated herein by reference. The 2011 Price Schedule "replace[d] the [2010 Price Schedule] in its entirety due to changes in the RNC Repair Process and Pricing. (Refer to the highlighted section 'RNC Repair Prices' herein)."

59.     Other than different (and higher) pricing for the repaired RNCs and additional language added to the repair section of the price schedule, the 2010 and 2011 price schedules were similar in all other material respects. The higher prices were a result of operations moving from China to Hong Kong. Plaintiff ING's margins on the to-be-repaired RNCs remained the same.

**V.**

**Defendant UPS's Repudiation and Breach of the UPS-ING Contract**

60.     When the Contract was executed in May 2010 and again in the fall of 2010, the Individual Defendants represented to Plaintiff ING that it would be receiving orders for new

RNCs in 2011 that exceeded the 230,000 estimate suggested in the Contract.  This representation was false and the Individual Defendants knew it because they intended all along not to provide a majority of the new RNC business in 2011 to Plaintiff ING, but rather to find a way to get around the Contract and obtain even lower pricing on new RNCs.

61.     Indeed, Defendant UPS breached the 2010 Primary Supplier Contract in several material respects.  For example, in July 2011, Defendant UPS and the Individual Defendants informed Plaintiff for the first time that an additional 624,000 new RNCs were needed for 2011, but that pricing for those additional units would be subject to a competitive bidding process.

62.     When Plaintiff informed Defendant UPS and the Individual Defendants that their approach was not consistent with the 2010 Primary Supplier Contract or the 2011 Price Schedule, Defendant Vollenweider on behalf of Defendant UPS, and with the approval of Defendants Rose and Thompson, said the following in an August 2, 2011 email to Plaintiff:

> As per our conversation, the agreement states the total quantity of RNCs for the three year agreement awarded to ING Global is estimated at 1.2MM.  UPS is not obligated to purchase 1.2MM RNCs or any additional RNCs above that amount from ING Global.  Additionally, an award was made to ING Global based on a number of factors including price but [] not solely on the lowest price.

> As I mentioned in our conversation UPS has a need this year for RNCs above the year two estimated quantity.  UPS is considering ING Global for these RNCs above the year two estimated quantity and requested [that] ING Global provide pricing.   The current pricing of $5.08/RNC (w/o transportation) is not competitive.

> UPS is offering ING Global the opportunity to revisit its pricing, adjust its pricing as applicable and submit a proposal to UPS.

> Please note that a decision to award the RNCs above the year two estimated quantity is planned this week.  Please indicate by 8/3/11 Wednesday if ING Global wishes to submit a proposal. . . .

63.     On August 5, 2011, Defendant Vollenweider, on behalf of Defendant UPS, and with the approval of Defendants Rose and Thompson, informed Plaintiff that "UPS had to move

expeditiously" and "made a decision to award the additional RNCs to a supplier other than ING Global." That supplier was none other than Defendant Bone Safety.

64.     On August 5, 2011, Defendant Thompson also emailed Plaintiff about the award of 624,000 additional RNCs to Defendant Bone Safety, stating:  "I'm aware of the bid, the contract we have in place for 2010-2012, and I agree 100% with the decision.  We're meeting our objectives for the original contract, this is a one off unplanned purchase that is not covered by the current contract, and you were not competitive.  I don't want to continue to debate this with you."  Defendant Thompson's representation that the 624,000 additional RNCs were a "one off unplanned purchase" was false and Defendant Thompson knew that it was false when he made it.

65.     Defendant Vollenweider's August 2, 2011 and August 5, 2011 emails to Plaintiff as well as Defendant Thompson's August 5, 2011 email constituted a clear repudiation and breach of numerous provisions of the 2010 Primary Supplier Contract and the 2011 Price Schedule.

66.     Furthermore, after Plaintiff ING won the Contract on May 3, 2010, Defendant UPS continued to provide Defendant Bone Safety—the two-time loser in the 2010 bidding process—with the repair business knowing that Defendant Bone Safety was illegally importing damaged RNCs into China.  Defendant Bone Safety was fully aware of the 2010 Primary Supplier Contract between Plaintiff ING and Defendant UPS and, despite that knowledge, continued to interfere with Plaintiff ING's contract and prospective business.  During 2010, Defendant UPS had approximately 200,000 – 250,000 RNCs suitable for repair.

67.     Ironically, shortly after wrongfully being awarded the additional 624,000 new RNCs for 2011, Defendant Bone Safety through its agent contacted Plaintiff ING's operations in

Hong Kong seeking price bids for manufacturing new RNCs for Defendant UPS and the Individual Defendants.

68.     At all times relevant herein, Defendant Bone Safety, together with the Individual Defendants, took numerous steps to undermine Plaintiff's status as the primary supplier of new and repaired RNCs for Defendant UPS.   Plaintiff ING's numerous attempts to resolve this dispute have failed, thereby requiring the filing of this lawsuit.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
### (Against Defendant UPS)

69.     Plaintiff incorporates paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     The 2010 Primary Supplier Contract and 2011 Price Schedule are valid and enforceable contracts.

71.     Defendant UPS's conduct amounts to an anticipatory repudiation of the 2010 Primary Supplier Contract and the 2011 Price Schedule, as alleged more fully in this Complaint.

72.     Defendant UPS has materially breached numerous provisions of the 2010 Primary Supplier Contract and 2011 Price Schedule by, among other things:  awarding Defendant Bone Safety 624,000 additional, new RNCs for 2011; making that award through a bidding process; purchasing the 624,000 additional, new RNCs at a price different than the one offered and accepted by Defendant UPS in the 2010 Primary Supplier Contract and the 2011 Price Schedule; and continuing to send Defendant Bone Safety the RNC repair business after May 3, 2010.

73.     Defendant UPS has also breached its duty of good faith and fair dealing that it owed to Plaintiff by engaging in unfair and deceptive practices in connection with its

performance of its obligations in the 2010 Primary Supplier Contract and the 2011 Price Schedule.

74.     As a proximate result of Defendant UPS's numerous breaches of the 2010 Primary Supplier Contract and the 2011 Price Schedule, Plaintiff ING has been damaged in an amount to be proven at trial, including damages for lost profits.

**COUNT TWO**
**Specific Performance**
**(Against Defendant UPS)**

75.     Plaintiff incorporates paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.     The 2010 Primary Supplier Contract and 2011 Price Schedule are valid and enforceable contracts.

77.     Defendant UPS has breached numerous provisions of the 2010 Primary Supplier Contract and 2011 Price Schedule by, among other things, awarding Defendant Bone Safety 624,000 additional, new RNCs for 2011.

78.     Based on the plain terms of the 2010 Primary Supplier Contract and 2011 Price Schedule, Plaintiff ING is entitled to a decree of specific performance commanding Defendant UPS to award it the 624,000 new RNCs at the price set forth in the 2011 Price Schedule.

**COUNT THREE**
**Fraud**
**(Against Defendant UPS and the Individual Defendants)**

79.     Plaintiff incorporates paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     Defendant UPS as well as the Individual Defendants fraudulently induced Plaintiff ING to enter into the 2010 Primary Supplier Contract and the 2011 Price Schedule by, among other things, representing to Plaintiff that:

(a)     the 2010 bid process was a one-round process rather than the two-round process that improperly forced Plaintiff to lower its RNC prices by 20%-30%;

(b)     the 2010 bid process was intended to establish a primary supplier of RNCs to Defendant UPS that would be awarded 100% of the repair business and a majority of the new RNC business between 2010-2012, when in truth Defendant UPS and the Individual Defendants did not intend to give Plaintiff the 2010 repair business or a majority of the 2011 new RNC business;

(c)     the repair process in China run by Defendant Bone Safety was being conducted legally when in fact it was not;

(d)     the cost of establishing new operations in Hong Kong to ensure minimal disruption in the supply of repaired RNCs would be offset by the profits that Plaintiff would make on the additional 2011 orders for new RNCs, when in truth Defendant UPS and the Individual Defendants did not intend to give Plaintiff any more than 230,000 new RNCs in 2011; and

(e)     Plaintiff's bids in the first round of the 2010 bidding process would be strictly confidential, when in fact the Individual Defendants disclosed Plaintiff's bids to other bidders prior to the second round of bidding.

81.     Plaintiff ING reasonably and justifiably relied on these representations, and has spent significant sums of its own money, and has lost money, in reliance on the Defendants' misrepresentations.

82.     Defendant UPS and the Individual Defendants intended to, and in fact did, deceive Plaintiff into believing that it would be the primary supplier of new and repaired RNCs

for the 2010-2012 period so that Defendant UPS could obtain new RNCs at prices below that set forth in the 2010 Primary Supplier Contract and the 2011 Price Schedule.

83.     Defendant UPS and the Individual Defendants wrongfully and deceptively manipulated the competitive bidding process in 2010 through a two-round bidding process that was not disclosed until the results of the first round were announced.

84.     Defendant UPS and the Individual Defendants wrongfully and deceptively manipulated the competitive bidding process in 2011 by pretending that such a process was necessary, when in fact no such process was allowed or contemplated by the 2010 Bid Form, the 2010 Primary Supplier Contract, or the 2011 Price Schedule.

85.     Defendant UPS and the Individual Defendants concealed their deceptive objectives from Plaintiff to, among other things, ensure that the prices on new RNCs would continue to decrease below the levels set out in the 2010 Primary Supplier Contract and the 2011 Price Schedule.

86.     Due to their close working relationship over several years, Defendant UPS and the Individual Defendants knew that Plaintiff was relying on their misrepresentations.

87.     As employees of Defendant UPS acting within the scope of their employment, the Individual Defendants knew about, participated in, and were principally responsible for making the decisions that resulted in fraudulent representations being made to Plaintiff.

88.     As a proximate result of the Defendants' fraud, Plaintiff has been damaged in an amount to be proven at trial.

89.     Defendants acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## COUNT FOUR
### Conspiracy to Commit Fraud
### (Against the Individual Defendants)

90.     Plaintiff incorporates paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.     The Individual Defendants conspired to defraud Plaintiff ING.

92.     The Individual Defendants agreed by and between themselves to fraudulently induce Plaintiff ING to enter into the 2010 Primary Supplier Contract and the 2011 Price Schedule by making the misrepresentations detailed in this Complaint.

93.     The Individual Defendants concealed their fraud to ensure that Defendant UPS would reap the benefits of continuously decreasing prices for new RNCs.

94.     The Individual Defendants took numerous steps in furtherance of their conspiracy to defraud Plaintiff by, among other things, making the misrepresentations to Plaintiff detailed in this Complaint.

95.     As employees of Defendant UPS acting within the scope of their employment, the Individual Defendants knew about, participated in, and were principally responsible for making the decisions that resulted in fraudulent representations being made to Plaintiff.

96.     As a proximate result of the Individual Defendants' conspiracy to defraud Plaintiff, Plaintiff has been damaged in an amount to be proven at trial.

97.     The Individual Defendants acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## COUNT FIVE
### Aiding and Abetting Fraud
### (Against the Individual Defendants)

98.     Plaintiff incorporates paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     The Individual Defendants aided and abetted one another in defrauding Plaintiff by providing substantial assistance to one another in furtherance of their wrongful scheme to drive down the prices for new RNCs, as detailed in this Complaint.

100.    The Individual Defendants concealed their fraud to ensure that Defendant UPS would reap the benefits of continuously decreasing prices for new RNCs.

101.    The Individual Defendants took numerous steps in furtherance of their intent to defraud Plaintiff by, among other things, making the misrepresentations to Plaintiff detailed in this Complaint.

102.    As employees of Defendant UPS acting within the scope of their employment, the Individual Defendants knew (or should have known) about, participated in, and were principally responsible for making the decisions that resulted in fraudulent representations being made to Plaintiff.

103.    As a proximate result of the Individual Defendants' aiding and abetting fraud, Plaintiff has been damaged in an amount to be proven at trial.

104.    The Individual Defendants acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

**COUNT SIX**
**Tortious Interference with Contract/Prospective Business Advantage**
**(Against Defendant Bone Safety)**

105.    Plaintiff incorporates paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    The 2010 Primary Supplier Contract and 2011 Price Schedule are valid and enforceable.

107.    Defendant Bone Safety was aware of the 2010 Primary Supplier Contract, the 2010 Price Schedule, and the 2011 Price Schedule.

108.    Defendant Bone Safety was aware that the 2010 Primary Supplier Contract, the 2010 Price Schedule, and the 2011 Price Schedule were valid and enforceable.

109.    Over the course of several months beginning in 2010, Defendant Bone Safety intentionally and without justification interfered with the 2010 Primary Supplier Contract and the 2011 Price Schedule by seeking to divert new and repair RNC business away from Plaintiff and to itself.

110.    Defendant Bone Safety engaged in this wrongful course of conduct because, among other things, it was a two-time loser of the 2010 competitive bidding process and it wanted to remain Defendant UPS's primary supplier at almost any cost.

111.    As a result of Defendant Bone Safety's wrongful actions, Defendant UPS gave it the 2010 RNC repair work as well as the majority of the new RNCs for 2011.

112.    As a proximate result of Defendant Bone Safety's tortious interference with Plaintiff's Contract and the 2011 Price Schedule, Plaintiff has been damaged in amount to be proven at trial, including lost profits.

113.   Defendant Bone Safety acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## COUNT SEVEN
### Unfair Competition
### (Against Defendant Bone Safety)

114.   Plaintiff incorporates paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.   Having lost twice in a competitive bidding process in 2010, Defendant Bone Safety wrongfully and without justification leveraged its personal relationship with Defendant Vollenweider to undo the results of the 2010 process.

116.   Defendant Bone Safety did so by urging Defendant UPS and the Individual Defendants to ignore their obligations to Plaintiff and the terms of the Contract between Plaintiff and Defendant UPS.

117.   Despite losing twice in the competitive bidding process, Defendant Bone Safety nevertheless continuously and unfairly presented Defendant UPS and the Individual Defendants with price proposals that were lower than those set forth in Plaintiff's Contract with Defendant UPS for the purpose of ensuring that it would receive a majority of the new RNCs.

118.   As a proximate result of Defendant Bone Safety's unfair competition, Plaintiff has been damaged in amount to be proven at trial, including lost profits.

119.   Defendant Bone Safety acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that, upon final judgment, it has judgment as follows:

1.  Judgment against Defendant UPS on Counts 1-3 of this Complaint.

2.  Judgment against the Individual Defendants on Counts 3-5 of this Complaint.

3.  Judgment against Defendant Bone Safety on Counts 6-7 of the Complaint.

4.  Against all Defendants for Plaintiff's reasonable attorneys' fees and expenses incurred to prosecute this action in this Court and on appeal, if necessary.

5.  Against the Defendants for all costs of Court.

6.  Against the Defendants for punitive and other damages.

7.  Against the Defendants for prejudgment and post-judgment interest.

8.  Against the Defendants for all other and further relief, both at law and in equity, to which Plaintiff may show itself justly entitled.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: August 16, 2011

Respectfully submitted,

PATTON BOGGS LLP

By: _____
John J. Zefutie, Jr. (JZ-9419)
The Legal Center
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102-0301
(973) 848-5600
Email:  jzefutie@pattonboggs.com

*Attorneys for Plaintiff*
*ING Global*

Of Counsel:

Ugo Colella (*pro hac vice application forthcoming*)
Michael J. Schaengold (*pro hac vice application forthcoming*)
**PATTON BOGGS LLP**
2550 M Street, N.W.
7th Floor
Washington, D.C. 20037
(202) 457-6620
Email:  ucolella@pattonboggs.com
        mschaengold@pattonboggs.com

### CERTIFICATION PURSUANT TO LOCAL RULE 83.7(d)(3)(A)

I certify that the damages recoverable exceed the sum of $150,000 exclusive of interest,

costs and any claim for punitive damages.

PATTON BOGGS LLP

By: _____
John J. Zefutie, Jr.
*Attorneys for Plaintiff*
*ING Global*