**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ING GLOBAL, | ECF CASE |
| *Plaintiff,* | |
| v. | Case No. 11-cv-5697 (JSR) |
| UNITED PARCEL SERVICE OASIS SUPPLY CORPORATION and BONE SAFETY SIGNS, LLC, | **AMENDED COMPLAINT** |
| *Defendants.* | |

Plaintiff ING Global ("ING" or "Plaintiff") for its Amended Complaint against Defendants United Parcel Service Oasis Supply Corporation ("UPS") and Bone Safety Signs, LLC ("Bone Safety") (UPS and Bone Safety are collectively referred to herein as the "Defendants") alleges as follows:

## PARTIES

1.     Plaintiff ING Global is a New York corporation with its principal place of business in New York.

2.     Defendant UPS is a Delaware corporation with its principal place of business in Atlanta, Georgia.

3.     Defendant Bone Safety is a limited liability company organized under the laws of the State of Georgia with its principal place of business in the State of Georgia.  Upon information and belief, no member of Bone Safety is a citizen or resident of the State of New York.

4.     Doug Vollenweider is a resident and citizen of the State of Georgia.  At all times relevant herein, Vollenweider was an authorized employee, agent, and representative of UPS

acting within the scope of his employment and/or agency.  Vollenweider represented to Plaintiff that he was affiliated with UPS Procurement Services and had decision-making authority within that organization and/or division of UPS.

5.    Michael Rose is a resident and citizen of the State of Georgia.  At all times relevant herein, Rose was an authorized employee, agent, and representative of UPS acting within the scope of his employment and/or agency.  Rose represented to Plaintiff that he was affiliated with UPS Corporate Procurement and had decision-making authority within that organization and/or division of UPS.

6.    James Thompson is a resident and citizen of the State of Georgia.  At all times relevant herein, Thompson was an authorized employee, agent, and representative of UPS acting within the scope of his employment and/or agency.  Thompson represented to Plaintiff that he was a manager and/or vice president of UPS's Corporate Procurement Group and had decision-making authority within that organization and/or division of UPS.

## JURISDICTION AND VENUE

7.    Plaintiff incorporates paragraphs 1 through 6 of this Complaint as if fully set forth herein.

8.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because it is between citizens of different States, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

9.    Venue is proper in this Court under 28 U.S.C. § 1391(a) because:  (i) a substantial part of the events material to Plaintiffs' causes of action occurred in this District, and (ii) all Defendants are subject to personal jurisdiction in this District at the time this action is commenced.

10.     The Defendants are subject to personal jurisdiction in this District because:  (i) Defendants UPS and Bone Safety continuously and systematically do business in the State of New York and derive substantial revenue from this State; (ii) the Defendants have purposefully directed their wrongful activities at the State of New York and have caused substantial harm within this State; (iii) the effects of the Defendants' wrongful conduct have been felt in the State of New York, as further alleged in this Amended Complaint; (iv) the Defendants' conduct made the State of New York the focal point of their breaches of contractual and legal duties owed to Plaintiff; and/or (v) the Defendants' wrongful conduct, as more fully set forth in this Amended Complaint, was intentionally and expressly aimed at the State of New York.

## FACTS COMMON TO ALL COUNTS

11.     Plaintiff incorporates paragraphs 1 through 10 of this Amended Complaint as if fully set forth herein.

12.     Plaintiff ING is a woman-owned, global manufacturer, importer, and distributor of various products, including bags used for the purpose of transmitting parcels around the world.

## I.
## Background to the ING-UPS Relationship

13.     United Parcel Service promotes itself as a multi-billion-dollar corporation that focuses on the goal of enabling commerce around the globe.  United Parcel Service advertises itself as a global company with one of the most recognized and admired brands in the world. United Parcel Service claims to be the world's largest package delivery company and a leading global provider of specialized transportation and logistics services.  United Parcel Service states that it manages the flow of goods, funds, and information in more than 200 countries and territories worldwide.

14.     Defendant UPS, among other things, supplies bags to United Parcel Service's operations in the United States and around the world.  The bags—commonly referred to as Reusable Network Containers ("RNCs")—are either newly manufactured or used bags that have been identified by UPS as repairable and available post-repair for re-use by United Parcel Service's operations.  RNCs are also referred to as "forever bags."

15.     The RNCs are critical to United Parcel Service's operations in the United States and around the world because parcels are sorted through the use of the RNCs and thereafter tracked to ensure proper and timely delivery.  According to Defendant UPS, it uses the RNC internally to consolidate numerous small packages into one bag to reduce the number of handlings in the UPS sorting and transportation system.  The RNCs increase UPS's productivity and speed in their operations in the United States and around the world.  The RNCs can be found in all aspects of United Parcel Service's business—in trucks, warehouses, and in their corporate headquarters.

16.     Among other things, Vollenweider, Rose, and Thompson (hereinafter, the "UPS Employees") are responsible for ensuring that United Parcel Service's worldwide operations are supplied with a sufficient number of bags, whether they be new or repaired RNCs.  The UPS Employees are also responsible for the bid and contracting process necessary to procure new and repaired RNCs for United Parcel Service's worldwide operations.  Thompson supervises Rose, who in turn supervises Vollenweider.

17.     Defendant UPS has a specific procurement process and six-step methodology through which it purchases new RNCs and services to repair used RNCs.  Once an order for RNCs (for either a single year or multi-year award) is approved, the results of the six-step strategy are presented to a committee called the Procurement Activity Review Committee

("PARCO").  PARCO "governs" the sourcing and acquisition of RNCs from "start to finish." As such, prior to any award of RNCs to a potential supplier, the results of the sourcing strategy and six-step methodology, along with an award and acquisition recommendation, are to be presented to PARCO for approval.  Upon receipt of that approval, Defendant UPS, through its Corporate Procurement, will draft and execute agreements with RNC suppliers.

18.     Prior to 2010, Defendant UPS entered into one-year contracts with new and repaired RNC suppliers.  Beginning in 2007, Plaintiff entered into one-year contracts with Defendant UPS for the supply of new RNCs. For the years 2007-2009, Plaintiff ING operated as a second or third-tier supplier of new RNCs to Defendant UPS.  In those years, Plaintiff ING did not supply Defendant UPS with repaired RNCs.

19.     During the 2007-2009 period, Defendant UPS did not award RNC supplier contracts through a Request for Proposal ("RFP") process or through a formal bidding process. Instead, the UPS Employees used e-mail and the telephone to solicit prices from prospective and current suppliers of new RNCs and chose suppliers on the basis of who provided UPS the lowest price.

20.     During the 2007-2009 period, ING's relationship with Defendant UPS was governed by a series of annual price schedules and a Master Purchase of Goods Agreement dated July 1, 2007 (the "2007 Master Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1** and incorporated herein by reference.

21.     In 2007, Defendant UPS asked Plaintiff to supply it with 200,000 new RNCs pursuant to two price schedules, the first of which was executed at the end of June 2007 and the second at the end of October 2007 (the "2007 Price Schedules").  A true and correct copy of the 2007 Price Schedules is attached hereto as **Exhibit 2** and incorporated herein by reference.

22.     The 2007 Price Schedules also provided that Defendant UPS "at its discretion may request an increase above" 100,000 new RNCs.  According to the 2007 Price Schedules, if UPS asked Plaintiff ING to supply more than 100,000 new RNCs, ING was required to "negotiate new pricing."  This "negotiate new pricing" provision of the 2007 Price Schedules was, according to Rose, "unusual."  Defendant UPS in fact did negotiate new RNC pricing with ING in 2007.  In October 2007, Defendant UPS ordered an additional 100,000 new RNCs from Plaintiff, but at a lower price than the first 100,000 RNCs that were subject to the June 2007 price schedule.

23.     In 2008, Defendant UPS asked Plaintiff to supply it with 200,000 new RNCs pursuant to a price schedule executed at the end of October 2008 (the "2008 Price Schedule").  A true and correct copy of the 2008 Price Schedule is attached hereto as **Exhibit 3** and incorporated herein by reference.  As in 2007, in 2008, Defendant UPS had the "discretion" to request "an increase" in new RNCs above the 200,000 specified in the 2008 Price Schedule.  However, unlike the 2007 Price Schedules, the 2008 Price Schedule did not require Plaintiff ING to negotiate new pricing if Defendant UPS asked ING to supply more than 200,000 new RNCs.

24.     In 2009, Defendant UPS asked Plaintiff to supply it with 100,000 new RNCs pursuant to a Price Schedule executed at the end of September/beginning of October 2009 (the "2009 Price Schedule").  A true and correct copy of the 2009 Price Schedule is attached hereto as **Exhibit 4** and incorporated herein by reference.  As with prior years, Defendant UPS had the discretion to request more than 100,000 new RNCs from Plaintiff ING.  And, like 2008, Plaintiff ING was not required to negotiate new pricing if Defendant UPS required ING to supply more than 100,000 new RNCs.

25.     During the 2007-2009 period, Defendant UPS required approximately 800,000 to 1 million new RNCs per year.  For those years, Plaintiff ING's commitment to the price specified in the price schedules lasted one year, except that in 2007 the price for new RNCs was required to be re-negotiated if Defendant UPS asked Plaintiff ING to supply it more than 100,000 bags.

26.     While Plaintiff ING was a second- or third-tier supplier during 2007-2009, Defendant UPS gave the majority of its new and all of its repair RNC business to Bone Safety Signs, a predecessor-in-interest to Defendant Bone Safety, a company that manufactures and sells signs and sign accessories.  Defendant Bone Safety was Defendant UPS's primary supplier between 2007-2009.  With respect to new RNCs, Defendant Bone Safety manufactured those bags in China in conjunction with an affiliated company named CPS-Zyco (or Ningbo Zyco Company).  With respect to repaired RNCs, those too were repaired in China through CPS-Zyco, but were shipped into China (through the Port of Ningbo) from Defendant Bone Safety's facility in Romeoville, Illinois.

27.     During the 2007-2009 period, Defendant Bone Safety received 100% of the RNC repair business and a majority (approximately 70%-80%) of Defendant UPS's new RNC business.

28.     According to a person working for UPS's operations in China, Defendant Bone Safety was able to import used RNCs into China for repair only through a "special relationship" between Defendant Bone Safety and customs in Ningbo, China (the then-port of destination for UPS's to-be-repaired RNCs).  According to a person knowledgeable about Defendant Bone Safety's operations in China, Bone Safety was permitted to import damaged RNCs into China only through an "under [the] table" (*i.e.*, improper) relationship with Ningbo customs.  This

knowledgeable person stated that "[w]e [at] UPS would never consider doing a thing like this." Several months after Plaintiff ING entered into the 2010 contract with Defendant UPS, Plaintiff learned for the first time that, in July or August 2009, Chinese authorities made it illegal to import used UPS bags into China.

29.     During the 2007-2010 period, the process for awarding RNC-supplier contracts was run primarily by Vollenweider, who was supervised by Rose and Thompson.  At all relevant times herein, Vollenweider maintained a long-time personal friendship with high-level contacts at Defendant Bone Safety.  At all times relevant herein, the Defendant UPS and the UPS Employees were fully aware, should have been aware, or had every opportunity to become aware, of the under-the-table relationship between Defendant Bone Safety and Ningbo customs. Nevertheless, prior to March 2010, Defendant UPS and the UPS Employees never asked Defendant Bone Safety questions about the legality of its China-based repair business; never asked Defendant Bone Safety to provide proof that its China-based RNC repair operation complied with applicable laws, rules, and regulations; or never asked Defendant Bone Safety to stop importing to-be-repaired bags into China.

## II.
### The Irregular 2010 Bidding Process for New and Repaired RNCs

30.     Between 2007 and 2010, Plaintiff was repeatedly commended for the quality and timely delivery of new RNCs to Defendant UPS.  According to the UPS Employees, ING's product and services during the 2007-2010 period was "excellent."  As of March 2010, ING was considered by Defendant UPS to be a company that had a clear understanding of the RNC product and was supported by strong manufacturing and distribution capabilities.

31.     Based on Plaintiff's prior "excellent" performance and status as an existing RNC supplier, Defendant UPS, through the UPS Employees, in 2010 encouraged and invited Plaintiff

to bid on Defendant UPS's contract for new and repair RNCs. Defendant Bone Safety was also invited to submit a bid, as were at least three other RNC suppliers.

32. Unlike in previous years, in 2010, Defendant UPS decided to enter into a longer-term relationship with an RNC supplier. Prior to 2010, the RNC repair program was never put out for bid; only the new RNC program was subject to competition. Defendant Bone Safety was awarded the repair RNC program every year between 2007-2009 because of that company's close relationship with Vollenweider, who claimed (incorrectly) that only Defendant Bone Safety had the ability to effectively run the RNC repair program for Defendant UPS.

33. The 2010 RNC contract was intended to be awarded through a bidding process that was not open to the public but was only available to suppliers approved by the Defendants. Although Vollenweider was in charge of the prior bid process for RNCs during the 2007-2009 period, in 2010, Vollenweider went out on leave on or about April 9, 2010 and did not return until on or about June 7, 2010. After Vollenweider went out on leave in April 2010, Rose took over the 2010 process for UPS's procurement of new and to-be-repaired RNCs.

34. The 2010 process of awarding RNC supplier contracts was more formalized than in previous years. Specifically:

(a) The 2010 process was conducted through Defendant UPS's online-based sourcing tool called ARIBA. Defendant UPS operated the ARIBA sourcing tool through its procurement support group, whose personnel worked in conjunction with Vollenweider and Rose during the 2010 RNC bid process. Vollenweider and Rose at all times relevant herein were aware of the information presented to prospective bidders (including ING) through the ARIBA platform.

(b)     Defendant UPS for the first time purported to base its decision to award RNC-supplier contracts (for new and repaired RNCs) on information received through an RFP run by and through UPS's ARIBA platform.

(c)     Vollenweider drafted and caused to be issued to prospective bidders (including ING) through the ARIBA platform an RFP that provided the details of the 2010 bid process for new RNCs.  ING received the RFP from Defendant UPS through its ARIBA system on or about March 22, 2010.  The front page of the RFP specified the "[d]ue" date and time of responses to the RFP as "March 29, 2010 @ 2:00 PM EDT."  Section I.B of the RFP likewise stated that "RFP responses *must be* submitted as directed in the instructions provided via the Ariba sourcing tool and are due on **March 29, 2010 by 2:00 PM EDT**."  (First emphasis added; second bold in original.)

(d)     In the RFP, Defendant UPS deemed the bids to be confidential and represented to Plaintiff that it would exercise reasonable care to limit access to those who have a need to know.

(e)     Vollenweider drafted and caused to be issued to prospective bidders (including ING) through the ARIBA platform a description of Defendant UPS's RNC repair program sufficient to allow ING and others to bid on UPS's purchase of repair services for reusable RNCs.  ING received the description of Defendant UPS's RNC repair program through the ARIBA system on or about March 31, 2010.

(f)     Vollenweider drafted and caused to be issued to prospective bidders (including ING) through the ARIBA platform a March 22, 2010 letter, in which Vollenweider stated in part:

UPS is evaluating companies via the Request for Proposal (RFP) process for the production of UPS Reusable Network Containers (RNCs). . . . The timeframe for the completion of the RFP is one week. All final RFP responses are due by March 29, 2010, prior to 2:00 PM EDT. [¶] The RFP is being distributed electronically via the UPS Ariba sourcing tool, no paper RFP documents are being sent out. [¶] The Electronic RFP that will follow this communication must be used as presented in order for your completed RFP response to be considered. The electronic RFP will include . . . the entire FRP documents for your review and response. [¶] Please access the sourcing tool upon receipt of the invitation on order for you to . . . ensure that your responses are submitted timely.

(g)     Vollenweider and Rose drafted and caused to be issued to prospective bidders (including ING) through the ARIBA platform a "Bid Form" that bidders were required to properly fill out and submit through the ARIBA system on or before the date specified in the RFP (hereinafter, the "First 2010 Bid Form").

35.     As stated in Vollenweider's March 22, 2010 letter, the bidding process for new RNCs was supposed to (a) open on March 22, 2010 and (b) close in "one week," or on March 29, 2010 at which time all "final" bids were to have been submitted to Defendant UPS for the purpose of awarding supplier contracts for new RNCs.

36.     ING received an email from Defendant UPS through the ARIBA system on March 22, 2010, in which Defendant UPS invited ING to submit bids to be a supplier of new

RNCs.   In that email, Defendant UPS, among other things, provided ING a username and password.   In substance and form, the March 22, 2010 email received by ING from Defendant UPS was sent to all prospective bidders.   ING submitted its bid for new RNCs on or about March 29, 2010.

37.      On or about March 22, 2010, Defendant UPS represented to suppliers in this bid that "[a]ll bids submitted through Ariba shall remain valid for a period of six months following the proposal round submission.   In the event that UPS requires additional time to make an award decision, UPS will work with the prospective supplier(s) to establish a mutually agreeable extension."   Defendant UPS did not state anywhere in the RFP Documents that it contemplated a multiple-bid process in which prospective suppliers would be required to submit more than one price bid for new RNCs.

38.      In formulating, calculating, and submitting its bid for new RNCs, ING Global relied on the representations made in the March 22, 2010 email from Defendant UPS through its ARIBA platform as well as the documents issued through ARIBA, which documents include: Vollenweider's March 22, 2010 letter to all prospective bidders; the RFP for new RNCs; and the First 2010 Bid Form for new and repaired RNCs (collectively referred to as the "RFP Documents").

39.      On March 29, 2010, at approximately 2:00:07 p.m. EDT, ING Global received an email from Defendant UPS through its ARIBA platform which stated in part: "Thank you for participating in the Ariba event . . . UPS 2010 Reusable Network Container RFP.   The event UPS 2010 Reusable Network Container RFP is now in Pending Selection and is no longer accepting responses.   We will analyze the responses and notify you of the outcome of the event."

40.     The bidding process for repaired RNCs opened on March 31, 2010 and was supposed to close on April 2, 2010.  On March 31, 2010, ING Global received an email from Defendant UPS through the ARIBA sourcing tool that invited ING to "participate" in the "event" titled "UPS 2010 Reusable Network Container Repair RFP."  In that email, Defendant UPS, among other things, provided ING a username and password.  In substance and form, the March 31, 2010 email received by ING from Defendant UPS was sent to all prospective bidders.  ING submitted its bid for repaired RNCs on or about April 2, 2010.

41.     On or about March 31, 2010, Defendant UPS represented that "[a]ll bids submitted through Ariba shall remain valid for a period of six months following the proposal round submission.  In the event that UPS requires additional time to make an award decision, UPS will work with the prospective supplier(s) to establish a mutually agreeable extension."  Defendant UPS did not state anywhere in the RFP Documents that it contemplated a multiple-bid process in which prospective suppliers would be required to submit more than one price bid for the RNC repair work.

42.     On April 2, 2010, at approximately 12:30 p.m. EDT, ING Global received an email from Defendant UPS through the ARIBA platform, which stated in part:  "Thank you for participating in the Ariba event . . . UPS 2010 Reusable Network Container Repair RFP.  The event UPS 2010 Reusable Network Container Repair RFP is now in Pending Selection and is no longer accepting responses.  We will analyze the responses and notify you of the outcome of the event."

43.     After the RFP issued on March 22, 2010 but before ING Global submitted its final bids for new and repaired RNCs on March 29, 2010 and April 2, 2010, respectively, Vollenweider represented to ING over the telephone that Defendant Bone Safety received a

"majority" of the new RNC orders because Bone was providing Defendant UPS repair services for UPS's used RNCs.  Vollenweider represented to ING Global that Defendant Bone Safety received approximately 70%-80% of the new bag orders from Defendant UPS during the years that Bone performed repair services.

44.     In addition to the representations made in the RFP Documents, ING Global relied on these representations by Vollenweider when it submitted its bids for the new and repair RNCs on March 29 and April 2, 2010.

45.     Despite being provided with the 2010 RFP for new and repaired RNCs through Defendant UPS's ARIBA sourcing tool, Defendant Bone Safety did not submit a bid for the repaired RNCs within the parameters set forth in the RFP Documents.  Nevertheless, at 2:34 p.m. EDT on April 2, 2010—approximately two hours after Plaintiff ING was informed by Defendant UPS that the RNC repair work "is now in Pending Selection" and that the ARIBA system was "no longer accepting responses"—Ben Buckley, a representative of Defendant UPS's procurement support group that was supposed to perform the financial analyses of the submitted bids, emailed Herman Brown, CEO of Defendant Bone Safety, and stated:  "Herman, I need you to quote this thing.  Please send it to me via email today[.]"

46.     Defendant Bone Safety submitted its bid for repaired RNCs on or about April 4, 2010, long after the bidding had closed on the RNC repair work (April 2, 2010).  Contrary to the representations made in the RFP Documents and in Defendant UPS's emails to Plaintiff through the ARIBA platform, Defendant UPS accepted and considered Defendant Bone Safety's out-of-time bid for repair work.  At all times relevant herein, Plaintiff had no knowledge of Defendant UPS's acceptance of Defendant Bone Safety's out-of-time bid.

After submitting its bids for new and repaired RNCs on March 31 and April 2, 2010, respectively, Rose informed Plaintiff ING that it had won the contract to be the primary supplier of new and repaired RNCs. Plaintiff ING's victory was short-lived, however.

47.     Having lost its long-held position as primary RNC supplier for Defendant UPS and having submitted at least one out-of-time bid that Defendant UPS improperly accepted, Rose represented to ING that Defendant Bone Safety complained to him and wanted another opportunity to bid on the new and repair RNC program. Rose stated to ING Global that Defendant Bone Safety was upset at not having the majority of the new RNC business and the repair business.

48.     Rather than respect and confirm the results of the first bid process and award Plaintiff ING the contract as primary supplier of new and repaired RNCs, Defendant UPS through Rose decided to give Defendant Bone Safety a second chance. Accordingly, Defendant UPS invalidated the results of the competitive bid process. Rose disclosed to Defendant Bone Safety the material terms of the bids submitted by Plaintiff ING, contrary to the confidentiality protections that Defendant UPS promised to Plaintiff.

49.     Nothing in the RFP Documents upon which Plaintiff relied (a) permitted Defendant UPS to deprive Plaintiff ING of its legitimate victory in the bidding process, or (b) stated, explicitly or implicitly, that the bid process would include more than one round of bidding. In fact, precisely the opposite was true. Plaintiff ING along with all other bidders were informed through the RFP Documents as well as Defendant UPS's representations made through the ARIBA sourcing tool that bidding would close on March 29, 2010 for new RNCs and on April 2, 2010 for the repair business.

50.     Despite the representations in the RFP Documents, Defendant UPS at all times intended to:  (a) conduct an RFP process that was comprised of multiple rounds of bidding and negotiation for the purpose of driving down the price of new RNCs and the repair service offered by prospective suppliers; and (b) award at least some of the new and repair RNC business to Defendant Bone Safety.  Defendant UPS concealed these objectives from Plaintiff ING.

51.     Rather than halt or otherwise delay the second round of bidding, Plaintiff ING had no choice but to agree to Defendant UPS's demand that ING relinquish its win and participate in a re-do of the bidding process for the new and repair RNC business.

52.     Because Plaintiff ING was forced by UPS to forego the results of the first bidding process, Defendant UPS required all prospective bidders to submit new bids.  Plaintiff ING did so and lowered its original price bids for the repair and new RNC business by approximately 20%-30%.

53.     In a telephone conference with ING Global on or about April 20, 2010, Rose represented to ING that the annual RNC procurement process was time-consuming and inefficient.  Consistent with the representations that Vollenweider made to ING prior to the first round of bidding, Rose stated to ING in their April 20, 2010 telephone conference that Defendant UPS intended to award the supplier of RNC repair services a "majority" of the new orders for RNCs.  In that same conversation, Rose represented to ING that he considered "majority" to mean 70%-80% of Defendant UPS's requirements for new RNCs.  Rose also stated to ING that he was an "honest man" that would honor Defendant UPS's commitment to give the supplier who performed repair services for UPS 70%-80% of the new orders for RNCs.

54.     In telephone conferences between ING Global and Rose between the April 20-May 3, 2010 period, Rose represented to ING that Defendant UPS's RNC needs would be better

served with a fixed-price RNC contract that exceeded one year. For example, in an April 22, 2010 email to Plaintiff ING, Rose stated: "The bottom line…UPS is seeking the best option for a multi-year award. If we are unable to identify an appropriate value for a multi-year award, then the award will revert to a single year award, with a bid to be performed each year thereafter." In that same email, Rose also represented to ING that (a) "UPS['s] planned purchases" over the 2010-2012 period was "1.7M RNCs, broken down as follows: Yr1 = 900K RNCs, Yr2 = 400K RNCs, Yr3 = 400K RNCs;" and (b) ING's proposed price "will be applied across all 3 years."

55.     In his April 22, 2010 email to ING, Rose also provided Plaintiff ING an example of how the purchase of new RNCs would work over a three-period on the assumption that 900,000 bags were "awarded":

Should a vendor be awarded 900k bags, the split may look something like:

> Yr1 = 500k
> Yr2 = 200k
> Yr3 = 200k

If the tiered pricing for 900k = $6/bag, then the purchase price in this example would be:

> Yr1 = $3M (500k x $6/RNC)
> Yr2 = $1.2M (200k x $6/RNC)
> Yr3 = $1.2M (200k x $6/RNC)

56.     Among other things, ING relied on the representations in Rose's April 22, 2010 email when it submitted its second-round bids for new and repaired RNCs.

57.     Using the required login information from the ARIBA platform, on or about April 21, 2010, Plaintiff ING obtained another RNC Bid Form (the "Second 2010 Bid Form"), a true and correct copy of which is attached hereto as **Exhibit 5** and is incorporated herein by reference. Defendant UPS and Rose were aware of the contents of the Second 2010 Bid Form.

According to Defendant UPS' ARIBA system, this bid opened on April 21, 2010 at 10:45 a.m. EDT, and it was supposed to close on April 28, 2010 at 12:00 p.m. EDT.

58.    In relevant part, the Second 2010 Bid Form provided to Plaintiff and other prospective RNC bidders was more detailed than the first, and it contained the following material information:

(a)    the "[e]stimated" number of bags needed for 2010 equaled 925,000;

(b)    the "[p]roject[ed]" number of bags needed for 2011 and 2012 was 400,000 per year;

(c)    under the heading "2011 and 2012 Delivery Schedule," Defendant UPS represented to Plaintiff and other RNC bidders that "[t]he annual volume requirement will be identified in advance of each calendar year, to allow for development of an appropriate delivery schedule to commence the month following the previous years['] order";

(d)    under the heading "Award Split," Defendant UPS represented to Plaintiff and other RNC bidders that "[d]ue to risk mitigation and long lead times, UPS anticipates making a split award between either 2 or 3 suppliers. *The intent is to identify a 'primary supplier,' to whom will be awarded at least 50% of the volume as well as the repair program. The remaining volume will be awarded to either a single supplier, or split between 2 suppliers ('secondary supplier(s)')*" (emphasis added);

(e)    under the heading "Continuous Delivery," Defendant UPS represented to Plaintiff and other prospective RNC bidders that "[t]he annual volume requirement will be identified in advance of each calendar year, to allow for development of an

appropriate delivery schedule to commence the month following the previous years['] order. *The intent will be to have deliveries of the awarded annual amount spread out over the calendar year*" (emphasis added);

(f) under the heading "Product Pricing," Defendant UPS represented to Plaintiff and other prospective RNC bidders that they were to submit pricing proposals "for all 3 years" to "ensure a proper analysis"; and

(g) in the portion of the Second 2010 Bid Form that dealt with proposals for the repair of RNCs, Defendant UPS reiterated its "intent" to "identify a 'primary supplier,' to whom will be awarded at least 50% of the volume as well as the repair program" and to award the "remaining volume" of new RNCs to one or two other suppliers.

Plaintiff ING relied on the representations in the Second 2010 Bid Form before it submitted its second round of bids to become the primary supplier of Defendant UPS's new RNCs and the sole supplier of repair services RNCs that needed repair.

59. On or about April 29, 2010, Plaintiff ING submitted bids for the new and repair RNC program.

60. Upon information and belief, Defendant Bone Safety did not timely submit bids for the new and repair RNCs in the second round. Defendant Bone Safety had formed another company that was its alter ego, a company named Shore-to-Door, LLC ("STD"). STD was run by Defendant Bone Safety. Other than the name, the only difference between the two companies was that STD was deemed to be a woman-owned business because Herman Brown, CEO of Defendant Bone Safety, inserted his wife (Helene Brown) as CEO of STD in contracts with

Defendant UPS. However, bids submitted on behalf of STD listed Herman Brown as the "contact/person preparing RFP."

61.     Defendant UPS and the UPS Employees always understood that STD, although technically a separate company in name from Defendant Bone Safety, was an alter ego and operated the same business as Defendant Bone Safety. Indeed, Defendant UPS and the UPS Employees always corresponded with Herman Brown when dealing with STD and, internally, always referred to Defendant Bone Safety and STD as one and the same company.

62.     Defendant UPS still accepted and considered STD's out-of-time bids, which were submitted to Defendant UPS by email (rather than through the ARIBA system) to Rose at 11:39 a.m. EDT on May 3, 2010. Plaintiff ING was unaware that Defendant UPS had once again accepted an out-of-time bid from Defendant Bone Safety/STD.

### III.
### ING Supposedly Becomes UPS's Primary Supplier of New and Repaired RNCs

63.     Plaintiff ING ultimately was awarded what it thought was the contract to be Defendant UPS's primary supplier of new and repaired RNCs for three years (*i.e.*, 2010-2012), but not before (a) ING had to engage in yet another, third round of bidding that drove its new RNC prices down even further, (b) Rose accepted a bid from Defendant Bone Safety/STD several days after bidding had closed, and (c) Rose violated Defendant UPS's procurement procedures by disregarding the recommendations of the PARCO Committee.

64.     Even though the first round of bidding closed on March 29/April 2, the second round closed on April 28, Defendant UPS did not stop there in its quest to drive down the prices of new RNCs. Defendant UPS, through Rose, continued to ask ING to lower its new RNC prices below even the lowered prices that it had submitted in the second round of bidding. Rose did so

even though the PARCO Committee had decided to make ING the primary supplier at the prices that ING submitted in the second round of bidding.

65.     As alleged, bidding for the second round of the RNC RFP was supposed to close on April 28, 2010. On April 30, 2010, a PARCO meeting was held to decide who should be awarded RNC supplier contracts as a result of the bidding process that began approximately one month earlier. PARCO decided on April 30, 2010 to award three-year RNC supplier contracts to two entities—Plaintiff ING and Nexus California Inc., with ING as the primary supplier of new RNCs who would also supposedly receive all of the repair work and with Nexus as a second-tier supplier of new RNCs.

66.     However, and contrary to Defendant UPS's procurement guidelines, Rose accepted a bid from Defendant Bone Safety/STD on May 3, 2010, five days after bidding had closed and four days after PARCO had already concluded that three-year contracts should be awarded to only two suppliers.

67.     Rose accomplished this by placing a "courtesy call" to Defendant Bone Safety/STD, who was by far the highest bidder for new RNCs in the second round of bidding. Rose got Defendant Bone Safety/STD to lower its new RNC price by a full dollar. Rose then used this out-of-time, post-PARCO lower bid to further drive down Plaintiff ING's price on new RNCs.

68.     Plaintiff's contract as the supposed primary supplier of RNCs for Defendant UPS was memorialized in two documents. First, the parties entered into a new Master Purchase of Goods Agreement (dated May 3, 2010) (hereinafter, the "2010 Master Agreement"), which replaced the 2007 Master Agreement that governed Plaintiff's role as second- or third-tier RNC supplier. A true and correct copy of the 2010 Master Agreement is attached hereto as **Exhibit 6**

and is incorporated herein by reference.  Second, the parties executed a Price Schedule (dated May 3, 2010) (hereinafter, the "2010 Price Schedule"), a copy of which is attached hereto as **Exhibit 7** and is incorporated herein by reference.  The 2010 Master Agreement and the 2010 Price Schedule are referred to herein as the "2010 Primary Supplier Contract" or the "Contract."

69.     The material terms of the 2010 Primary Supplier Contract were as follows:

(a)     the Contract was for a fixed term of three years and for a fixed price on both new and repaired RNCs, with the contract setting out a specific set of circumstances that allowed changes to the price for new and repaired RNCs (2010 Master Agreement, §§ 1, 3; 2010 Price Schedule, "Quantity" & "Pricing Terms" & Exh. E);

(b)     under the heading "Award Consideration," the 2010 Price Schedule states that "[t]he award of the Repairs aligns with the supplier receiving a majority of the orders for new RNCs";

(c)     for 2010, Defendant UPS estimated that it would require 740,000 new RNCs, and that "[a]ny quantity above 740,000 will be considered as an order placed against the Year 2 [2011] volume";

(d)     Defendant UPS did not have an accurate estimate of its 2011 and 2012 requirements (because the 2010 Primary Supplier Contract was entered into in May 2010), and UPS therefore estimated that it would require 230,000 new RNCs for each of those two years;

(e)     Defendant UPS estimated that, for the period 2010-2012, they would require 1.2 million new RNCs, that it had the "discretion" to "adjust the quantity stated

herein," and that "*[a]dditional quantities will be purchased at the identified pricing in [the 2010 Price Schedule]*" (emphasis added);

(f)     the Contract specified the process for changing the pricing of new and repaired RNCs: "All identified prices . . . shall remain in effect throughout the life of [the 2010 Price Schedule] unless both parties agree to adjust such prices to reflect volume discounts, raw material price increase/decrease for resin, currency rate fluctuations, or such other reasons as the parties may identify";

(g)     the Contract also specified the timing of any change to new RNC price in the event that the parties identified reasons that justified a price change:   "Price adjustments shall only be considered annually when the Delivery Schedule is provided to [Plaintiff ING] by [Defendant UPS]" (original emphasis);

(h)     with regard to price changes to new RNCs, the Contract specified that "[a]djustments [to price] will be based on applicable indexes as of the date the Delivery Schedule is provided to [Plaintiff ING] as compared to a baseline established on May 30, 2010";

(i)     with regard to price reductions for repair RNCs, the Contract permitted such reductions only if UPS "handle[d] the transportation of the repair bags from the UPS location to the [ING]-directed port, and then back to the appropriate UPS location";

(j)     the Contract prescribed a delivery schedule for 2010, requiring Plaintiff ING to deliver all 740,000 units to the "port of export" (*i.e.*, Ningbo, China) by October 29, 2010;

(k)     the Contract also prescribed a delivery schedule for 2011 and 2012, representing that "[i]n advance" of those years, Defendant UPS "will provide [Plaintiff ING] the requested quantities and Delivery Schedule";

(l)     with respect to the volume of repairs, the Contract stated that "UPS has experienced an average annual Repair quantity of approximately 125,000" and that "[t]his information is for historical reference only and does <u>not</u> constitute a guarantee or commitment of future Repair quantities" (original emphasis);

(m)     the Contract required Plaintiff ING to "maintain an[] inventory of repair material so as not to interrupt the flow of repaired product"; and

(n)     the Contract required Plaintiff ING to "make every reasonable effort to process the Repairs in as efficient, effective and timely manner as possible, with an anticipated turn around of thirty (30) days . . . ."

70.     In 2010, Defendant UPS asked Plaintiff ING to fill thirty-four (34) orders for new RNCs between June 15 and November 2, 2010, for a total volume of 744,000 RNCs. A true and correct copy of the invoices for the 2010 orders is attached hereto as **Exhibit 8**.

71.     However, even though Plaintiff ING was awarded 100% of Defendant UPS's repair business, ING received none of that business in 2010. Instead, Defendant Bone Safety/STD continued to perform, and to be paid for, repair services for Defendant UPS after UPS entered into the Contract with Plaintiff ING. That is because, without ING's knowledge, and contrary to the representations in the RFP Documents and in the Second 2010 Bid Form, Defendant UPS entered into a supplier contract with Defendant Bone Safety's alter ego STD, in which UPS retained the discretion to award the repair business to STD at the prices set forth in STD's out-of-time bid. Contrary to the representations in the RFP Documents and in the Second

2010 Bid Form, Defendant UPS entered into a similar repair-service arrangement with a third supplier (Nexus California Inc.).

72.      In 2011, Defendant UPS asked Plaintiff ING to fill only ten (10) orders for new RNCs and only for two weeks in January (January 10-24), for a total volume of 230,100 RNCs. A true and correct copy of the invoices for the 2011 orders is attached hereto as **Exhibit 9**. Plaintiff ING received no additional orders for new RNCs for the year 2011.

73.      As they had in the past, with respect to Plaintiff ING's performance of its Contract obligations during 2010 and 2011, Defendant UPS and the UPS Employees repeatedly stated to Plaintiff ING that its work product and adherence to the prescribed delivery schedules were unmatched by other suppliers.

74.      Indeed, with respect to the 740,000 new RNCs timely delivered by Plaintiff ING, Defendant UPS and the UPS Employees represented to Plaintiff that they were being pressured to deliver such a high volume of bags in just a few months, and that the 740,000 were considered to be a "special delivery."  When Plaintiff ING met Defendant UPS's objectives to supply the 740,000 RNCs by the end of October 2010, Defendant UPS and the UPS Employees thanked and praised Plaintiff for its work.

### IV.
### Serious Problems with the RNC Repair Program; Plaintiff ING
### Provides a Solution that is Accepted by UPS

75.      Despite being awarded 100% of the repair program, Defendant UPS did not provide Plaintiff ING any of the repair business in 2010.  After being awarded the Contract in May 2010, Plaintiff repeatedly asked the UPS Employees and the person in charge of Defendant UPS's storage facility in Illinois (Don Miller) when the RNCs in need of repair would be provided to Plaintiff.  Defendant UPS, through the UPS Employees, represented to Plaintiff that

the to-be-repaired RNCs would be forthcoming.  This was a misrepresentation and the UPS Employees knew it because they continued to provide Defendant Bone Safety/STD the RNC repair business after May 3, 2010.

76.     At the same time, immediately after being awarded the repair program, Plaintiff ING began the process of establishing operations in China to handle the import and repair of damaged UPS bags.  However, in the fall of 2010, Plaintiff ING learned for the first time that Defendant Bone Safety was illegally importing damaged RNCs into China, that such importation was allowed by virtue of an "under [the] table" (i.e., improper) relationship between Bone Safety and Ningbo customs, and that the Chinese authorities would not permit Plaintiff ING to import damaged RNCs into China.  The Chinese authorities informed ING over the phone and in writing that they considered such goods to be hazardous materials (i.e., solid waste).

77.     After being told by the Chinese authorities that importing damaged RNCs into China was not permissible and illegal, Plaintiff ING brought this to the attention of Defendant UPS and the UPS Employees.  The UPS Employees became very angry with Plaintiff and threatened to terminate the Contract if ING continued to say that Defendant UPS's supplier (Defendant Bone Safety/STD) was engaged in illegal activity.  Plaintiff ING stated to the UPS Employees in clear and unmistakable terms that it would never operate illegally in China and that it would never enter into any "under the table" relationship with Chinese customs or its agents.

78.     Even though Plaintiff ING could not conduct repairs in China and even though ING's pricing for the repair program assumed that repairs would be made in China, ING insisted on working with Defendant UPS and the UPS Employees on finding a solution to the problem. Plaintiff spent significant funds in connection with finding a new location to import damaged

RNCs for repair.  ING looked at establishing a facility in Mexico, Canada, Thailand, South Africa, Vietnam, Cambodia, Egypt, and Hong Kong.

79.     Plaintiff ING eventually established a facility in Hong Kong.  To facilitate Defendant UPS's RNC repair business, Plaintiff, among other things:  entered into a lease for space to run the repair operation; hired labor; purchased machinery; and trained workers. Plaintiff ING spent at least approximately $1 million to set up the Hong Kong factory for Defendant UPS's RNC repair business.

80.     ING spent this money to, among other reasons, make the UPS-ING relationship stronger and longer lasting.  The UPS Employees were under a tremendous amount of pressure to find a way of moving the growing number of containers that housed to-be-repaired RNCs at UPS's facility in Illinois.  Defendant UPS and the UPS Employees checked with other vendors to see if they had a viable solution to their problem, but none of those vendors had one.  Plaintiff ING is the company that provided the solution to Defendant UPS's problem.

81.     At all times relevant herein, Defendant UPS and the UPS Employees knew, approved, encouraged, and aggressively pushed Plaintiff to find an alternative location for carrying on UPS's RNC repair business.  At all times relevant herein, Defendant UPS and the UPS Employees knew that Plaintiff ING was spending significant funds to ensure that UPS's RNC repair program would continue with minimal disruption.  Accordingly, on April 15, 2011, Defendant UPS and Plaintiff ING entered into Price Schedule #2 (hereinafter, the "2011 Price Schedule"), a true and correct copy of which is attached hereto as **Exhibit 10** and incorporated herein by reference.  The 2011 Price Schedule "replace[d] the [2010 Price Schedule] in its entirety due to changes in the RNC Repair Process and Pricing.  (Refer to the highlighted section 'RNC Repair Prices' herein)."

82.     Other than different (and higher) pricing for the repaired RNCs and additional language added to the repair section of the price schedule, the 2010 and 2011 price schedules were similar in all other material respects.  The higher prices were a result of operations moving from China to Hong Kong.  Plaintiff ING's margins on the to-be-repaired RNCs remained the same.

## V.
### Defendant UPS's Repudiation and Breach of the UPS-ING Contract

83.     Defendant UPS breached the 2010 Primary Supplier Contract in several material respects.  In July 2011, Defendant UPS and the UPS Employees informed Plaintiff for the first time that an additional 624,600 new RNCs were needed for 2011, but that pricing for those additional RNCs would be determined on the basis of an informal bidding process, which was directly contrary to the six-step methodology that was supposed to be followed for the sourcing and acquisition of new RNCs.

84.     That informal bidding process proceeded as follows.  Vollenweider called each one of the three suppliers that had RNC contracts with Defendant UPS, sought a new price for the additional RNCs, represented that the price had to be below their respective contract prices to be competitive, and then played the suppliers off one another to obtain the lowest possible price for the additional 624,600 new RNCs.

85.     When Plaintiff informed Defendant UPS and the UPS Employees that their approach was not consistent with the 2010 Primary Supplier Contract or the 2011 Price Schedule, Vollenweider on behalf of Defendant UPS, and with the approval of Rose and Thompson, said the following in an August 2, 2011 email to Plaintiff:

> As per our conversation, the agreement states the total quantity of RNCs for the three year agreement awarded to ING Global is estimated at 1.2MM.  UPS is not obligated to purchase 1.2MM RNCs or any additional RNCs above that amount

from ING Global. Additionally, an award was made to ING Global based on a number of factors including price but [] not solely on the lowest price.

As I mentioned in our conversation UPS has a need this year for RNCs above the year two estimated quantity. UPS is considering ING Global for these RNCs above the year two estimated quantity and requested [that] ING Global provide pricing. The current pricing of $5.08/RNC (w/o transportation) is not competitive.

UPS is offering ING Global the opportunity to revisit its pricing, adjust its pricing as applicable and submit a proposal to UPS.

Please note that a decision to award the RNCs above the year two estimated quantity is planned this week. Please indicate by 8/3/11 Wednesday if ING Global wishes to submit a proposal. . . .

86.     On August 5, 2011, Vollenweider, on behalf of Defendant UPS, and with the approval of Rose and Thompson, informed Plaintiff that "UPS had to move expeditiously" and "made a decision to award the additional RNCs to a supplier other than ING Global." That supplier was none other than Defendant Bone Safety/STD.

87.     On August 5, 2011, Thompson also emailed Plaintiff about the award of 624,600 additional RNCs to Defendant Bone Safety/STD, stating: "I'm aware of the bid, the contract we have in place for 2010-2012, and I agree 100% with the decision. We're meeting our objectives for the original contract, this is a one off unplanned purchase that is not covered by the current contract, and you were not competitive. I don't want to continue to debate this with you."

88.     The award of 624,600 additional RNCs to Defendant Bone Safety/STD was at a price that was below $5 per bag. This was no coincidence, however. Rose and Vollenweider were aware in December 2010 (after Defendant UPS entered into the Contract with Plaintiff ING) that they could obtain pricing for new RNCs that was below that set forth in the Contract. On May 5, 2010—just two days after Plaintiff ING had entered into the Contract with Defendant UPS—Defendant Bone Safety's affiliate in China, CPS-Zyco (Ningbo Zyco Company),

contacted Defendant UPS and falsely accused Plaintiff of using "prison labor" to perform its RNC-related work.

89.   A few days later, on May 11, CPS-Zyco emailed Rose seeking to retain Defendant Bone Safety/STD's lost status as UPS's primary supplier: "We would like to know if there is any opportunity to talk with you about a possible way to continue to supply bags to UPS?" In e-mail correspondence with Rose on May 17, 2010, CPS-Zyco informed Rose that CPS-Zyco "would have been under $5.00 delivered to your door." Rose knew in May 2010 that CPS-Zyco was affiliated with Defendant Bone Safety.

90.   On December 17, 2010, Rose forwarded CPS-Zyco's May 17, 2010 email to Vollenweider to make him aware that Defendant UPS could purchase new RNCs for less than $5 per bag. According to Rose's December 17, 2010 email to Vollenweider: "This is from the manufacturer you had a discussion with yesterday . . . . note he stated a cost of "under $5.00 delivered to your door."

91.   Vollenweider knew as of November 29, 2010 that Defendant UPS would need to purchase at least 800,000 new RNCs in 2011. Yet, in a telephone call with Plaintiff ING on or about December 14, 2010, Vollenweider and/or Rose told ING's principal to "shut up" when she pressed Vollenweider for UPS's 2011 new RNC requirements, even though the plain terms of the Contract required Defendant UPS to provide those requirements to ING at that time. On that December 14, 2010 phone call, Vollenweider and/or Rose went further and lied to ING, stating that Defendant UPS's only new RNC requirements for 2011 would be the 230,000 specified in the Contract. On behalf of Defendant UPS, Vollenweider and/or Rose were untruthful about Defendant UPS's 2011 RNC requirements because he intended in December 2010 to pursue the

sub-$5 price for new RNCs, and UPS's 2011 requirement of an additional 624,600 new RNCs provided him that very opportunity.

92.     The award of 624,600 additional RNCs to Defendant Bone Safety/STD was made in violation of Defendant UPS's internal procurement procedures, which expressly require that all awards of RNCs be authorized after a PARCO process has been completed and PARCO approves the procurement decision.  Defendant UPS's procedures for purchasing RNCs state in clear and mandatory terms that "[p]rior to an award, Procurement and IE *will* present the sourcing results with the award and acquisition recommendation to PARCO *for approval*." (Emphasis added). The additional 624,600 RNCs were ordered at least as early as July 1, 2011 and the price schedule that governed those additional RNCs was fully executed in late September 2011.

93.     There was more than enough time to proceed through the PARCO process and seek, and ultimately obtain, PARCO approval for the award of the additional 624,600 new RNCs.  Indeed, the formalized RFP process that was followed in 2010—with an RFP, bidding through the ARIBA sourcing tool, multiple rounds of bidding and negotiation, and ultimate PARCO approval—took less time than was taken to award the additional 624,600 new RNCs to Defendant Bone Safety/STD.

94.     Thompson allegedly only sought approval from his superior Linda MacLean before authorizing the award of the additional 624,600 RNCs to Defendant Bone Safety/STD. Thompson's superior was only one of many persons that comprise an appropriate PARCO.

95.     Vollenweider's August 2, 2011 and August 5, 2011 emails to Plaintiff as well as Thompson's August 5, 2011 email constituted a clear repudiation and breach of numerous provisions of the 2010 Primary Supplier Contract and the 2011 Price Schedule.

96.     Furthermore, after Plaintiff ING won the Contract on May 3, 2010, Defendant UPS continued to provide Defendant Bone Safety and its alter ego STD—the two-time losers in the 2010 bidding process—with the repair business knowing that Defendant Bone Safety/STD was illegally importing damaged RNCs into China.  Defendant Bone Safety was fully aware of the 2010 Primary Supplier Contract between Plaintiff ING and Defendant UPS and, despite that knowledge, continued to interfere with Plaintiff ING's contract and prospective business. During 2010, Defendant UPS had approximately 200,000 – 250,000 RNCs suitable for repair.

97.     Ironically, shortly after wrongfully being awarded the additional 624,600 new RNCs for 2011, Defendant Bone Safety/STD through its agent contacted Plaintiff ING's operations in Hong Kong seeking price bids for manufacturing new RNCs for Defendant UPS.

98.     At all times relevant herein, Defendant Bone Safety/STD, together with the UPS Employees, took numerous steps to undermine Plaintiff's status as the primary supplier of new and repaired RNCs for Defendant UPS.  Plaintiff ING's attempts to resolve this dispute have failed, thereby requiring the filing of this lawsuit.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
### (Against Defendant UPS)

99.     Plaintiff incorporates paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.   The 2010 Primary Supplier Contract and 2011 Price Schedule are valid and enforceable contracts.

101.   Defendant UPS's conduct amounts to an anticipatory repudiation of the 2010 Primary Supplier Contract and the 2011 Price Schedule, as alleged more fully in this Amended Complaint.

102.   Defendant UPS has materially breached numerous provisions of the 2010 Primary Supplier Contract and 2011 Price Schedule by, among other things:  awarding Defendant Bone Safety/STD 624,600 additional, new RNCs for 2011; making that award through a bidding process; purchasing the 624,600 additional, new RNCs at a price different than the one offered and accepted by Defendant UPS in the 2010 Primary Supplier Contract and the 2011 Price Schedule; and continuing to send Defendant Bone Safety/STD the RNC repair business and pay for those services after May 3, 2010 and April 15, 2011.

103.   Defendant UPS has also breached its duty of good faith and fair dealing that it owed to Plaintiff by engaging in unfair and deceptive practices in connection with its performance of its obligations in the 2010 Primary Supplier Contract and the 2011 Price Schedule.

104.   As a proximate result of Defendant UPS's numerous breaches of the 2010 Primary Supplier Contract and the 2011 Price Schedule, Plaintiff ING has been damaged in an amount to be proven at trial, including damages for lost profits.

## COUNT TWO
### Fraud
### (Against Defendant UPS)

105.   Plaintiff incorporates paragraphs 1 through 104 of this Amended Complaint as if fully set forth herein.

106.   Defendant UPS fraudulently induced Plaintiff ING to enter into the 2010 multiple-round bidding process, the 2010 Primary Supplier Contract, and the 2011 Price Schedule by making the following misrepresentations to Plaintiff:

(a)   As stated in the RFP Documents and the emails generated through Defendant UPS's ARIBA platform, the 2010 bid process was supposed to close on March

29, 2010 for new RNCs and April 2, 2010 for repaired RNCs and that all "final" bids were to be submitted by those dates. This was a misrepresentation because Defendant UPS, through Vollenweider and Rose, intended to conduct a multiple-round bidding process that required prospective bidders to continuously bid against themselves by lowering their RNC prices.

(b)    As stated in emails generated through Defendant UPS's ARIBA platform, the second round of the 2010 bid process was supposed to close on April 28, 2010 for new and repaired RNCs. This was a misrepresentation because Defendant UPS, through Rose, intended to continue seeking bids and lower prices on new RNCs after April 28 and even after PARCO had met and recommended an award.

(c)    As stated in Vollenweider's March 22, 2010 letter to Plaintiff ING (and all other prospective bidders), the "Electronic RFP . . . must be used as presented in order for your completed RFP response to be considered." This was a misrepresentation because Defendant UPS, through Vollenweider and Rose, intended to permit bidding outside of the "Electronic RFP" for the purpose of driving down the prices at which UPS would have to purchase new RNCs.

(d)    As stated in the RFP documents, Plaintiff's bids in the first round of the 2010 bidding process would be strictly confidential. This was a misrepresentation because Defendant UPS, through Rose, disclosed Plaintiff's prices to Defendant Bone Safety/STD for the purpose of driving down the prices at which UPS would have to purchase new RNCs.

(e)    As stated in Rose's April 22, 2010 email to Plaintiff and in the Second 2010 Bid Form, Defendant UPS would award, and be obligated to purchase, new RNCs and

repair services from a "primary supplier."  This was a misrepresentation because Defendant UPS (i) never intended to be contractually obligated to purchase any new RNCs from Plaintiff; (ii) never intended to be contractually obligated to purchase repair services from Plaintiff; and (iii) never intended to have a "primary supplier" of RNCs.

(f)     As stated in the Second 2010 Bid Form, Defendant UPS would award the "repair program" only to the primary supplier.  This was a misrepresentation because Defendant UPS never intended to award the repair program to Plaintiff, but rather retained the discretion in its contracts with Defendant Bone Safety/STD and Nexus to purchase repair services from those suppliers at prices set forth in those suppliers' respective contracts.

(g)     As stated in the Second 2010 Bid Form, Defendant UPS would award the primary supplier "at least 50% of the volume" of new RNCs.  This was a misrepresentation because Defendant UPS (i) never intended to be contractually obligated to purchase any new RNCs from Plaintiff; (ii) never intended to have a "primary supplier" of RNCs; and (iii) never intended to provide Plaintiff "at least 50% of the volume" of new RNCs.

(h)     As stated in the Second 2010 Bid Form, "[t]he remaining volume will be awarded to either a single supplier, or split between 2 suppliers ('secondary supplier(s)')." This was a misrepresentation because Defendant UPS: (i) never intended to have "secondary suppliers"; (ii) never intended to be contractually obligated to purchase any new RNCs from Plaintiff; and (iii) never intended to have only two suppliers.

(i)     As stated by Rose and Thompson to Plaintiff in a meeting in March 2011 at UPS headquarters in Atlanta, the cost of establishing new operations in Hong Kong to ensure minimal disruption in the supply of repaired RNCs would be offset by the profits that Plaintiff would make on the additional 2011 orders for new RNCs. This was a misrepresentation because Defendant UPS:  (i) never intended to purchase from Plaintiff any more than 230,000 new RNCs in 2011; (ii) never intended to be contractually obligated to purchase any new RNCs from Plaintiff; and (iii) never intended to be contractually obligated to purchase any repair services from Plaintiff.

(j)     As stated in the RFP Documents and the bid forms, Defendant UPS represented that the 2010 process of selecting suppliers of new and repaired RNCs would be based on the merits of the prospective bidders' proposals.   This was a misrepresentation because Defendant UPS always intended to retain Defendant Bone Safety/STD as a supplier of new RNCs and a supplier of repair services.

(k)     As stated in the RFP Documents, the "successful supplier shall produce . . . and deliver finished RNCs in the quantities . . . specified in the RFP."  This was a misrepresentation because Defendant UPS never intended to be contractually obligated to purchase any new RNCs from Plaintiff.

(l)     As stated in the RFP Documents, "[p]ricing submitted in response to this proposal shall be considered firm for the period of this award" unless "raw material price changes affect the product cost portion of the program."   This was a misrepresentation because Defendant UPS:  (i) never intended to treat Plaintiff's price for new RNCs as "firm for the period of this award"; (ii) never intended to

be contractually obligated to purchase any new RNCs at the price set forth in the Contract; and (iii) instead, intended to seek from Plaintiff lower prices for new RNCs during the Contract period.

(m)  As stated in the RFP Documents, "[a] multiple year contract is to be considered with the expectation the committed extended term would allow the successful supplier(s) to offer additional cost savings . . . ." This was a misrepresentation because Defendant UPS never intended to be contractually obligated to purchase any new RNCs at the "cost saving[]" price set forth in the Contract.

107.  Plaintiff ING reasonably and justifiably relied on Defendant UPS's misrepresentations, and spent significant sums of its own money, and lost money, in reliance on those misrepresentations.  For example, as a result of Defendant UPS's misrepresentations about the 2010 bidding process, Plaintiff was forced to reduce its prices for new RNCs by 20%-30%.

108.  Defendant UPS made the aforementioned misrepresentations with the intent to deceive Plaintiff into believing that it would be the primary supplier of new and repaired RNCs for the 2010-2012 period so that Defendant UPS could obtain new RNCs at prices below that set forth in the 2010 Primary Supplier Contract and the 2011 Price Schedule.  Plaintiff was in fact deceived by those misrepresentations.

109.  Defendant UPS wrongfully and deceptively manipulated the competitive bidding process in 2010 through a multiple-round bidding process that was never disclosed to Plaintiff ING prior to ING's participation in the bidding process.

110.  Defendant UPS through the UPS Employees concealed their deceptive objectives from Plaintiff to, among other things, ensure that the prices on new RNCs would continue to

decrease below the levels set out in the 2010 Primary Supplier Contract and the 2011 Price Schedule.

111.   Due to their close working relationship over several years, Defendant UPS through the UPS Employees, who were the face of UPS, knew that Plaintiff was relying on the misrepresentations set forth in this Amended Complaint.

112.   As employees of Defendant UPS acting within the scope of their employment, Vollenweider, Rose, and Thompson knew about, participated in, and were principally responsible for making the decisions that resulted in fraudulent representations being made to Plaintiff.

113.   The RFP Documents make clear that neither the RFP prepared by Vollenweider nor the bid forms were part of any contractual obligation assumed by Defendant UPS.

114.   As a proximate result of Defendant UPS's fraud, Plaintiff has been damaged in an amount to be proven at trial.

115.   Defendant UPS, through the UPS Employees, acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages in an amount to be proven at trial.

## COUNT THREE
### Tortious Interference with Contract/Prospective Business Advantage
### (Against Defendant Bone Safety)

116.   Plaintiff incorporates paragraphs 1 through 115 of this Amended Complaint as if fully set forth herein.

117.   The 2010 Primary Supplier Contract and 2011 Price Schedule are valid and enforceable.

118.   Defendant Bone Safety/STD was aware of the 2010 Primary Supplier Contract, the 2010 Price Schedule, and the 2011 Price Schedule.

119.     Defendant Bone Safety/STD was aware that the 2010 Primary Supplier Contract, the 2010 Price Schedule, and the 2011 Price Schedule were valid and enforceable.

120.     Over the course of several months beginning in 2010, Defendant Bone Safety/STD intentionally and without justification interfered with the 2010 Primary Supplier Contract and the 2011 Price Schedule by seeking to divert new and repair RNC business away from Plaintiff and to itself.

121.     Defendant Bone Safety/STD engaged in this wrongful course of conduct because, among other things, it was a two-time loser of the 2010 competitive bidding process and it wanted to remain Defendant UPS's primary supplier of new RNCs and of repair services.

122.     As a result of Defendant Bone Safety's wrongful actions, Defendant UPS gave it and its alter ego STD the 2010 RNC repair work as well as the majority of the new RNCs for 2011.   Indeed, even though Plaintiff was deemed to be the "primary supplier" of RNCs to Defendant UPS and even though Defendant Bone Safety/STD was deemed to provide "the lower tier volume (100k bags each year – total of 300k bags for three years)," Defendant Bone Safety and its alter ego STD have been given almost the same number of new RNC orders over the 2010-2011 period as Defendant UPS gave to Plaintiff ING during the same period.

123.     As a proximate result of Defendant Bone Safety/STD's tortious interference with Plaintiff's Contract and the 2011 Price Schedule, Plaintiff has been damaged in amount to be proven at trial, including lost profits.

124.     Defendant Bone Safety/STD acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## COUNT FOUR
### Unfair Competition
### (Against Defendant Bone Safety)

125.    Plaintiff incorporates paragraphs 1 through 124 of this Amended Complaint as if fully set forth herein.

126.    Having lost twice in a competitive bidding process in 2010, Defendant Bone Safety/STD wrongfully and without justification leveraged its personal relationship with Defendant Vollenweider to undo the results of the 2010 process.

127.    Defendant Bone Safety did so by urging Defendant UPS and the UPS Employees to ignore their obligations to Plaintiff and the terms of the Contract between Plaintiff and Defendant UPS.

128.    Despite losing twice in the competitive bidding process, Defendant Bone Safety/STD nevertheless continuously and unfairly presented Defendant UPS and the UPS Employees with price proposals that were lower than those set forth in Plaintiff's Contract with Defendant UPS for the purpose of ensuring that it would receive a majority of the new RNCs.

129.    As a proximate result of Defendant Bone Safety/STD's unfair competition, Plaintiff has been damaged in amount to be proven at trial, including lost profits.

130.    Defendant Bone Safety/STD acted recklessly, with evil motive and actual malice, and in willful disregard for the rights of Plaintiff, entitling Plaintiff also to an award of punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that, upon final judgment, it has judgment as follows:

1.      Judgment against Defendant UPS on Counts 1-2 of this Amended Complaint.

2.      Judgment against Defendant Bone Safety on Counts 3-4 of the Amended Complaint.

3.      Judgment against all Defendants for Plaintiff's reasonable attorneys' fees and expenses incurred to prosecute this action in this Court and on appeal, if necessary.

4.      Judgment against the Defendants for all costs of Court.

5.      Judgment against the Defendants for punitive and other damages.

6.      Judgment against the Defendants for prejudgment and post-judgment interest.

7.      Judgment against the Defendants for all other and further relief, both at law and in equity, to which Plaintiff may show itself justly entitled.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: November 28, 2011                    Respectfully submitted,


                                            **PATTON BOGGS LLP**

                        By:     *Ugo Colella /s*
                                            Ugo Colella (admitted *pro hac vice*)
                                            John J. Zefutie, Jr. (JZ-9419)
                                            The Legal Center
                                            One Riverfront Plaza, 6th Floor
                                            Newark, New Jersey 07102-0301
                                            (973) 848-5600
                                            (202) 457-6620
                                            Email:  ucolella@pattonboggs.com
                                            Email:  jzefutie@pattonboggs.com

                                            *Attorneys for Plaintiff*
                                            *ING Global*

## CERTIFICATION PURSUANT TO LOCAL RULE 83.7(d)(3)(A)

I certify that the damages recoverable exceed the sum of $150,000 exclusive of interest,

costs and any claim for punitive damages.

PATTON BOGGS LLP

By: _____

John J. Zefutie, Jr.
*Attorneys for Plaintiff,*
*ING Global*