**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ING GLOBAL,<br><br>               Plaintiff,<br><br>     v.<br><br>UNITED PARCEL SERVICE OASIS<br>SUPPLY CORPORATION,<br><br>               Defendant. | Case No. 11-cv-5697 (SC)<br><br>Hon. Samuel Conti<br><br>Trial Date: October 3, 2012 |
| UNITED PARCEL SERVICE OASIS<br>SUPPLY CORPORATION,<br><br>               Counter-Claimant,<br><br>     v.<br><br>ING GLOBAL,<br><br>               Counter-Defendant. | |

# PLAINTIFF ING GLOBAL'S TRIAL BRIEF

## **TABLE OF CONTENTS**

INTRODUCTORY STATEMENT .................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

ARGUMENT ................................................................................................ 4

I.     UPS BREACHED ITS CONTRACT WITH ING. ............................... 4

     A.     UPS Materially Breached the Contract Because ING did not Receive a
            Majority of UPS's Orders for New RNCs During 2011. ...................... 5

     B.     UPS Breached the Contract Because it Provided the Repair Work to a
            Supplier who Expressly was *Not* Awarded the Repair Work through the
            2010 RFP Process and who had no Written Contract with UPS to Perform
            the Work. ............................................................................................ 11

II.    AS A RESULT OF UPS'S BREACH OF CONTRACT, ING HAS SUFFERED
     SPECIFIC AND QUANTIFIABLE DAMAGES. .......................................... 12

III.   UPS'S COUNTERCLAIM FOR BREACH OF CONTRACT LACKS MERIT. ............. 14

CONCLUSION ........................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Citizens Trust Bank v. White*,
    618 S.E.2d 9 (Ga. Ct. App. 2005) ........................................................ 5

*Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*,
    458 S.E.2d 170 (Ga. Ct. App. 1995) .................................................... 5

*In re Outdoor Displays Welding & Fabrication, Inc.*,
    84 B.R. 260 (Bankr. S.D. Ga. 1988) .................................................. 10

*Jackson Elec. Membership Corp. v. Georgia Power Co.*,
    257 Ga. 772 (1988) ............................................................................ 5

*Jeff Goolsby Homes Corp v. Smith*,
    308 S.E.2d 564 (Ga. App. 1989) ........................................................ 13

*Jinright v. Russell*,
    182 S.E.2d 328 (Ga. App. 1971) ........................................................ 15

*L&B Constr.*, 482 S.E.2d at 281 ................................................................ 10

*Nu-Life Contr. Corp. v. Bd. of Educ. of City of New York*,
    789 F. Supp. 103 (E.D.N.Y. 1992) ...................................................... 13

*S. Fed. Sav. & Loan Ass'n of Atlanta v. Lyle*,
    290 S.E.2d 455 (Ga. 1982) ............................................................ 5, 6

*S. Tank Equip. Co. v. Zartic, Inc.*,
    471 S.E.587 (Ga. App. 1996) .............................................................. 5

*Shaw v. Ruiz*,
    428 S.E.2d 98 (Ga. App. 1993) .......................................................... 13

*Spithogianis v. Haj-Darwish*,
    No. 07-CV-4609 (PAC)(JCF), 2008 WL 82188 (S.D.N.Y. Jan. 7, 2008) ................ 5

*T.E.A.M. Entm't, Inc. v. Douglas*,
    361 F. Supp. 2d 362 (S.D.N.Y. 2005) .................................................. 5

*Yargus v. Smith*,
    562 S.E.2d 371 (Ga. Ct. App. 2002) .................................................... 10

STATUTES

C.P.L.R. §§ 5001(a), 5004 ........................................................................ 14

Ga. Code Ann. § 11-2-610 ........................................................................................ 15

Ga. Code Ann. § 13-2-2 (2010) ................................................................................. 5

Ga. Code Ann. § 13-4-23 .......................................................................................... 15

O.C.G.A. § 13-6-9 ..................................................................................................... 13

Article 2 of the Uniform Commercial Code ................................................................ 5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(c) .................................................................................................... 5

Pursuant to this Court's September 10, 2012 Order, Plaintiff ING Global ("ING") respectfully submits this Trial Brief in support of its claim for breach of contract against Defendant United Parcel Service Oasis Supply Corporation ("UPS") and in support of its defense against UPS's counterclaim.

## INTRODUCTORY STATEMENT

This case involves a three-year supplier contract between Plaintiff ING Global and Defendant UPS. ING is a woman-owned business run by Nira Soomekh out of New York. Under the supplier contract, ING agreed to sell, and UPS agreed to annually purchase, reusable network containers ("RNCs"), also known as "forever bags." RNCs are oversized bags that UPS uses in its domestic distribution hubs to move small packages more quickly through its delivery system.

The process by which ING won the three-year supplier contract was long, arduous, and required ING to bet against itself on several occasions. Nevertheless, after a five-week, multiple-round bidding process, ING ultimately prevailed and became UPS's "primary supplier" of RNCs for the period 2010-2012.

Because ING was deemed to be UPS's "primary supplier" of RNCs, the ING-UPS supplier contract required UPS to purchase a majority of RNCs from ING each year as well as services to repair all used RNCs at prices fixed in the contract. The purpose of repairing used RNCs was to lower UPS's costs; the RNC repair price was far lower than the price of a new RNC. Prior to 2010, UPS thus sought to incentivize the supplier who handled the repair program by purchasing large amounts of new RNCs from that supplier (usually 70%-80% of UPS's annual RNC requirements).

In year one of the supplier contract term (2010), and consistent with its prior practice as well as its contractual obligation to purchase a "majority" of new RNCs from ING, UPS

purchased approximately 78-79% of its new RNCs from ING. Those RNCs were delivered to UPS in record time.

However, UPS breached the supplier contract from day one because it continuously, and without notice to ING, purchased repair services from another RNC supplier who came in last in the 2010 bidding process; who was told orally and in writing that it lost the repair bid; who had no written contract with UPS to provide repair services; and who charged UPS more per used RNC than its losing 2010 bid.

In 2011, UPS breached the supplier contract with ING by purchasing only 22% of its new RNCs from ING. Instead of honoring its three-year, fixed-price contract with ING, UPS obtained lower prices from other suppliers and awarded almost 60% of the new RNCs purchased that year to the supplier who came in *last* in the 2010 bid process.

The 2011 breach was material. According to UPS itself, the economics underlying the 2010 contract required that the entity performing repair services receive a "large amount" of the orders for new RNCs to ensure what UPS dubbed a "continuous build." Without that "large amount" of RNCs, a supplier had little or no incentive to perform the repair services for UPS because the margins are low.

Accordingly, UPS's 2011 breach substantially impaired the value of ING's three-year supplier contract to ING. UPS informed ING on August 2, 2011 that, contrary to the terms of the contract and UPS's prior performance, UPS in fact was not obligated to purchase *any* RNCs from ING. This representation rendered ING's three-year supplier contract illusory and was a clear and material breach of the parties' contract. Because of UPS's material breach of contract, ING declined to perform repair services for UPS. ING is seeking expectation and reliance damages for UPS's material breaches of the ING-UPS contract.

UPS, however, claims that it did not breach the ING-UPS supplier contract because it was not obligated to purchase any new RNCs from ING at any time, and it was not obligated at any time to purchase repair services from ING.  According to UPS, it was obligated to purchase new RNCs and repair services from ING only if it chose to do so in its sole discretion.  But at the same time, UPS asserts a counterclaim against ING, claiming that ING's failure to perform repair services constituted a material breach of the ING-UPS supplier contract.

On April 9, 2012, Judge Rakoff issued a "bottom line" order holding that ING's breach of contract claim and UPS's counterclaim are to be decided by a jury.  ING argued that UPS materially breached the contract when it refused to purchase a "majority" of RNCs in 2011.  ING claims that its contract obligated UPS to purchase significantly more RNCs

Both ING and UPS argued that the contract at issue was unambiguous and required entry of summary judgment in their favor.  Because Judge Rakoff denied both motions and set ING's contract claim and UPS's contract counterclaim for trial, we assume that Judge Rakoff found certain provisions of the UPS-ING contract ambiguous thereby requiring jury consideration and resolution.

## STATEMENT OF FACTS

ING refers this Court to its Statement of Facts set forth in its Memorandum of Law in Support of its Motion for Partial Summary Judgment against UPS; its Rule 56.1 Statement of Undisputed Material Fact, filed under seal on February 10, 2012 ("Pl.'s 56.1 Statement"); the exhibits annexed to the Declaration of John J. Zefutie, Jr., filed under seal on February 10, 2012; its Response to UPS' Additional Facts, filed under seal on March 2, 2012; and the exhibits annexed to the Declaration of John J. Zefutie, Jr., filed under seal on March 2, 2012.[1]  The core

---

[1]      UPS and ING agreed to a Stipulated Protective Order in the form set forth in the Honorable Jed S. Rakoff's Individual Rules and Practices.  (DI 31).  Many, if not all, of the

facts of this case, however, are interwoven in ING's arguments below.  Citations to the public

docket ("DI") are used to reference the relevant documents attached to ING's Amended

Complaint.   Those documents comprise the Contract at the center of this dispute.  Furthermore,

ING notes that an opinion accompanying Judge Rakoff's "bottom line" order granting and

denying in part summary judgment has not yet been issued.  Thus, the issues and facts discussed

herein may change depending on Judge Rakoff's reasoning.

## ARGUMENT

**I.      UPS BREACHED ITS CONTRACT WITH ING.**

The contract at issue in this case consists of three separate, but related documents:  (1) the

Master Purchase of Goods Agreement, dated May 3, 2010 (the "Master Agreement") (DI 32-6);

(2) a Price Schedule, also dated May 3, 2010 (the "2010 Price Schedule") (DI 32-7); and (3) a

Price Schedule #2, dated April 15, 2011 (the "2011 Price Schedule") (DI 32-10).  We will refer

to the Master Agreement, the 2010 Price Schedule, and the 2011 Price Schedule as the

"Contract."[2]

---

documents produced by UPS in this matter were marked either "Confidential" or "Highly
Confidential."     Because UPS originally asserted a counterclaim styled as "Breach of
Confidentiality," ING submitted its evidence in support of its summary judgment motion under
seal pursuant to that Protective Order.  ING, nonetheless, intends to rely on documents marked
either Confidential or Highly Confidential at trial for three reasons. First, UPS eventually agreed
to file one of its briefs on the public record; those briefs purport to reference confidential
information. (*See* DI 69).  Second, Judge Rakoff's Protective Order, which is controlling in this
case, states in no uncertain terms: "All persons are hereby placed on notice that the Court is
unlikely to seal or otherwise afford confidential treatment to any Discovery Material introduced
into evidence at trial, even if such material has previously been sealed or designated as
Confidential." (DI 31, ¶ 9).  Third, Judge Rakoff granted ING's motion for summary judgment
on UPS's "Breach of Confidentiality" counterclaim.

[2]      The Contract is governed by Georgia law.  (DI 32-6, ¶ 15).

UPS admits that the Master Agreement and the 2011 Price Schedule are valid and enforceable contracts. Pl's 56.1 Statement, at ¶ 62. Under applicable Georgia law,[3] a valid and enforceable contract is one that is supported by consideration and imposes obligations on *all parties to the contract. See Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*, 458 S.E.2d 170, 171 (Ga. Ct. App. 1995) (holding that "mutuality" is an essential element of a contract for the sale of goods); *Citizens Trust Bank v. White*, 618 S.E.2d 9, 11 (Ga. Ct. App. 2005) ("A definite offer and complete acceptance, for consideration, create a binding contract.").[4]  Accordingly, the only remaining issue is whether UPS breached the Contract.  The evidence will show that UPS materially breached the Contract.

### A.    UPS Materially Breached the Contract Because ING did not Receive a Majority of UPS's Orders for New RNCs During 2011.

"Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." *S. Fed. Sav. & Loan Ass'n of Atlanta v. Lyle*, 290 S.E.2d 455, 459 (Ga. 1982); *see also* Ga. Code Ann. § 13-2-2 (2010) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."). Where,

---

[3]    Because these contracts primarily involve the sale of goods, Article 2 of the Uniform Commercial Code applies. *See S. Tank Equip. Co. v. Zartic, Inc.*, 471 S.E.587, 504-05 (Ga. App. 1996) (citing *J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 433 S.E.2d 687 (Ga. App. 1993).

[4]    UPS has not asserted the affirmative defenses that the Contract lacks consideration or mutuality of obligation. *See* Fed. R. Civ. P. 8(c). The defenses are therefore deemed waived.  The general rule is that a failure to plead an affirmative defense results in a waiver. *T.E.A.M. Entm't, Inc. v. Douglas*, 361 F. Supp. 2d 362, 367 (S.D.N.Y. 2005) (citing *Travellers Int'l v. Trans World Airlines*, 41 F.3d 1570, 1580 (2d Cir. 1994)).    Lack of consideration and lack of mutuality of obligation are affirmative defenses that can be waived if not timely pled. *See Spithogianis v. Haj-Darwish*, No. 07-CV-4609 (PAC)(JCF), 2008 WL 82188, at *4 n.2 (S.D.N.Y. Jan. 7, 2008); *see generally Jackson Elec. Membership Corp. v. Georgia Power Co.*, 257 Ga. 772, 774 n.2 (1988) (noting that "the supposed requirement of mutuality of obligation is merely one of mutuality of consideration") (internal citations omitted).

as here, "contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." *S. Fed. Dav. & Loan Ass'n of Atlanta*, 290 S.E.2d at 459.

ING will prove that, every year between 2010 and 2012, UPS was obligated to purchase from ING a "majority" of the new RNCs that UPS required at a price of $5.08 per bag, even if UPS's requirements for a given year exceeded the "estimated" quantities set forth in the Contract. Pl. 56.1 Statement, at ¶¶ 27, 31. This interpretation is compelled by two provisions in the Contract:  (1) "additional quantities" over and above the "estimated" quantities "*will be* purchased at the identified pricing in this Price Schedule," and (2) ING is to "*receiv[e]*," and UPS is obligated to purchase, "a *majority* of the *orders* for new RNCs." *Id.* at ¶¶ 29, 31 (emphasis added).

In 2010, UPS purchased a majority of its RNC requirements from ING, when it bought 744,000 new bags from ING out of a total of approximately 938,000-944,000 total bags purchased (or, roughly 79% of UPS's total requirements). *Id.* at ¶ 64.  In 2011, however, UPS indisputably did *not* purchase a "majority" of its RNC requirements from ING.  The evidence shows that in July 2011, John Harris, on behalf of Corporate IE, asked that UPS purchase an additional 624,629 new RNCs (the "2011 Additional Quantity").[5] *Id.* at ¶ 45.  Corporate IE determined that the 2011 Additional Quantity was required to supplement the current domestic RNC inventory due to increased demand. *Id.* at ¶ 47.

At the time Corporate IE requested the 2011 Additional Quantity, UPS's suppliers under contract (including ING, who supposedly was the "primary supplier") had already manufactured RNCs to the exact specifications of the 2011 Additional Quantities. *Id.* at ¶ 48.  The specifications of the 2011 Additional Quantity as well as the delivery terms therefore were no

---

[5]     The Request for Procurement actually describes the order as an "[a]dvanced 2012 order." Pl.'s 56.1 Statement, at ¶ 46.

different than the bags already manufactured and delivered by ING. *Id.* at ¶ 49. According to the manager ultimately in charge of purchasing RNCs, the 2011 Additional Quantities were "the same bags that [UPS] had in the past." *Id.* at ¶ 50. That is why the 624,629 new RNCs were "additional quantities" within the plain meaning of the 2011 Price Schedule, a fact admitted by two UPS employees, including a top-level manager. *Id.* at ¶ 51.

Moreover, prior to the summer of 2011, UPS purchased 430,000 new RNCs for use during 2011. *Id.* at ¶ 52. Of that amount, 230,100 were purchased from ING, with the balance split evenly between UPS's other RNC suppliers. *Id.* at ¶ 53. UPS, however, wanted a price on the 2011 Additional Quantity that was lower than that agreed-to by UPS and ING in the 2010 and 2011 Price Schedules. *Id.* at ¶ 54. The 2011 Price Schedule specifically addressed situations in which RNC pricing could change, but that required agreement ***between UPS and ING only***, an agreement that was supposed to be reached at a particular time using particular indices expressly set out in the price schedule. *Id.* at ¶¶ 67-70. The evidence will show that, in seeking a lower RNC price for the 2011 Additional Quantities, UPS simply ignored the 2011 Price Schedule—it did not negotiate only with ING and it did not use any indices or other price-changing criteria prescribed by the 2011 Price Schedule. *Id.* at ¶ 55. Instead, UPS just put out the additional quantities for informal bidding.

UPS eventually purchased the entirety of the 2011 Additional Quantity from ING's competitor, Bone Safety Signs, LLC, by way of a separate master purchase of goods agreement and price schedule. *Id.* at ¶ 56. Prior to making that purchase and materially breaching ING's contract, Vollenweider made clear UPS's intent to repudiate its obligations under the Contract, telling ING that "UPS [was] not obligated to purchase 1.2 MM RNCs or any additional RNCs above that amount from ING." *Id.* at ¶ 58. Thus, of the 1,054,600 RNCs that UPS purchased in

2011, it purchased only 230,100 from ING, or approximately 22% of the orders received by the UPS procurement group. *Id.* at ¶ 60. UPS's purchase of only 22% of the 2011 RNC orders cannot conceivably equate with "receive[ing] a majority of the orders for new RNCs," as required by the Contract.

Furthermore, the evidence shows that language in the Contract prohibited UPS from seeking lower pricing for the 2011 Additional Quantities from other suppliers. The Contract states plainly that RNC pricing can be changed *only* according to a very specific protocol expressly set forth in the 2011 Price Schedule and *only* between UPS and ING, as follows:

- Paragraph 3 ("Purchase Price") of the Master Agreement states that "[t]he entire purchase price of the goods shall be set forth in the Price Schedule" and that ING "agrees that prices for [RNCs] shall remain in effect for the period of time set forth" in that Schedule. Pl.'s 56.1 Statement, ¶ 65. Like the 2010 Price, the 2011 Price Schedule sets the price for new RNCs at $5.08 per bag, and the term of the agreement is three years commencing on May 3, 2010. *Id.* at ¶ 66.

- The contract provision in the 2011 Price Schedule titled "Term of Supplier's Price Commitment" details the process for changing the pricing of new RNCs, including the timing and criteria used to make such price changes, as follows:

  - "All identified prices . . . shall remain in effect throughout the life of [the 2011 Price Schedule] *unless both parties agree* to adjust such prices to reflect volume discounts, raw material price increase/decrease for resin, currency rate fluctuations, or such other reasons as the parties may identify . . . ." *Id.* at ¶ 67 (emphasis added).

  - "Price adjustments shall *only* be considered annually when the Delivery Schedule is provided to [ING] by [UPS]." *Id.* at ¶ 68 (bold added; original emphasis).

  - "Adjustments [to price] will be based on applicable indexes as of the date the Delivery Schedule is provided to [ING] as compared to a baseline established on May 30, 2010." *Id.* at ¶ 69

  - ING is obligated to provide UPS "with thirty (30) days prior written notice of any price increase/decrease or anticipated price increase/decrease. Price adjustments will not be considered for any adjustments of less than 10%." *Id.* at ¶ 70.

Nowhere in the Contract does it state—explicitly or implicitly—that UPS was free to re-bid new RNC pricing for purchases above the "estimated" quantities in the 2010/2011 price schedules. In fact, the 2011 Price Schedule states exactly the opposite: "*Additional quantities will be purchased at the identified pricing in this Price Schedule* [$5.08/bag]" and UPS agreed each year to purchase a "*majority*" of the RNCs it required from ING at that price. Pl.'s 56.1 Statement, ¶¶ 29, 31 (emphasis added). UPS knows how to include price re-negotiation language in its supplier agreements because it did so—*expressly*—in the 2007 price schedules with ING's predecessor (Nira, Inc.) and in its other RNC supplier contracts. Pl.'s 56.1 Statement, at ¶¶ 71-74. That language, indisputably, is absent from the Contract here.

That the Contract's "majority" requirement should be applied to UPS's annual RNC purchases is consistent with the purpose of the "majority" requirement, as that purpose was explained by the drafter of ING's 2010 Price Schedule—UPS Commodity Manager Mike Rose. According to Rose, the "majority" provision for new RNCs was intertwined with the repair program to ensure that ING (and UPS derivatively) would benefit from "efficiencies" associated with a continuous manufacturing process. Pl.'s 56.1 Statement, at ¶ 34. Further, in an April 28, 2010 internal email exchange concerning when RNCs would begin "flowing again," Rose explained that the "continual manufacturing" of RNCs by one (primary) supplier over three years was essential:

> Our plan is to award for a 3 year term. For the 2010 orders to have production begin as soon as the award is identified…[T]his should allow first arrival by August . . . with plans to complete the entire order this year. We will need to identify the 2011 needs by Sept 15 *so we can have the vendor continue manufacturing at the appropriate level*, and allow us to begin receiving orders immediately following the 2010 completion, with a steady supply provided throughout the year in 2011. *We can easily increase the order if needed after Sept 15. The same process will apply for the 2012 orders. This should smooth out the orders to a consistent quantity month after month, which should benefit*

> *our cost planning, and assist in dropping the unit price of the RNCs due to continual manufacturing.*

*Id.* at ¶ 75 (emphasis added).[6]

UPS says that, even though it entered into a three-year contract with ING as its "primary supplier" of RNCs, it was not obligated under the Contract to purchase even a single RNC from ING at any time.  UPS also apparently believes that it had the right to purchase all of its RNCs from any supplier at any price that it wanted—even though UPS in 2010 conducted a long bid process purportedly intended to fix RNC pricing for three years through three suppliers. Accordingly, UPS's position is that it could enter into the Contract with ING, purchase nothing from ING, purchase as many new or repaired RNCs from any supplier that it wanted, and still not breach the Contract.

We do not believe that a jury will accept this extreme view of the Contract.  As we have demonstrated, read as a whole, the Contract requires UPS to purchase a majority of its new RNCs and all of its repaired RNCs from ING each year from 2010-2012.  UPS indisputably did not do so.

---

[6]     Pl.'s 56.1 Statement, at ¶ 23.  To the extent that Judge Rakoff concluded that the term "majority" is ambiguous, it should be construed in ING's favor because, under applicable Georgia law, contracts are construed strictly against the drafter—in this case, UPS.  *See Yargus v. Smith*, 562 S.E.2d 371, 374 (Ga. Ct. App. 2002) ("Since the printed and typed contract was formulated by the defendant, then the agreement must be construed most strongly against him."); *see also L&B Constr.*, 482 S.E.2d at 281 ("[A]ny ambiguities in a contract must be construed against the drafter . . . ."); *In re Outdoor Displays Welding & Fabrication, Inc.*, 84 B.R. 260, 264 (Bankr. S.D. Ga. 1988) (interpreting Georgia law and noting "[t]here is a strong rule of contract construction which requires that ambiguities in language be resolved against the interest of the contract's drafter").

**B.**    **UPS Breached the Contract Because it Provided the Repair Work to a Supplier who Expressly was _Not_ Awarded the Repair Work through the 2010 RFP Process and who had no Written Contract with UPS to Perform the Work.**

In the Contract, UPS awarded the entire repair program to ING in May 2010. Pl.'s 56.1 Statement, at ¶ 25. However, there is no dispute that, at Vollenweider's direction, UPS continued to send RNC repair work to ING's competitor, Shore-to-Door LLC ("Shore"), after ING won the RNC repair-work contract. _Id._ at ¶ 41. And UPS **did so with no written agreement in place**. _Id._ (emphasis added). This, too, was a clear breach of the Contract. There also is no dispute that UPS paid more for the repaired RNCs than Shore proposed charging in its (failed) bid for repair work; paid more than was set forth in Shore's 2010 price schedule, which provided for repair pricing "[i]f UPS elects to award the RNC Repair Program" to Shore (which it never did); and paid significantly more than the winning repair-work bid submitted by ING during the 2010 RFP process. _See id._ at ¶ 42. Indeed, UPS does not dispute that, between May 2010 and July 2011, it paid Shore approximately $1 million for repairing used RNCs.

UPS's actions seem inexplicable. However, certain individuals within UPS's procurement department apparently believe they are not bound by their own contracts or UPS's internal procedures. Unbeknownst to ING at the time, UPS's purchase of repair services from Shore with no contract in place appears to have been a pattern and practice of those in charge of purchasing RNCs for UPS. Between 2008 and 2009, another RNC supplier affiliated with Shore, a company called Bone Safety Signs ("Bone Safety"), did not have a written contract to perform repair services, but UPS paid Bone Safety anyway according to pricing that apparently was orally agreed-to. _Id._ at ¶ 78. UPS's official position is that it doesn't know who actually entered into the oral agreement for repair work. _Id._ at 79. Nevertheless, UPS's internal

procedures strictly prohibit this type of business conduct, yet UPS's RNC procurement employees do not believe that they are bound by those procedures. *Id.* at ¶ 80.

Finally, the repair work was supposed to be performed in China, and UPS chose to transport used RNCs to China so that ING could perform the repairs there. Despite having chosen to transport the used RNCs, UPS blamed ING for not being able to import used RNCs into China. The evidence will show that ING had no way of knowing when it bid in March/April 2010 that the manner in which the RNC repair program was previously conducted apparently involved illegal conduct. Specifically, Bone Safety's importation of used RNCs into China appears to have been accomplished through, what a UPS employee in China discovered was an "under [the] table" relationship between the company that performed repair work for Bone and Port of Ningbo customs officials. *Id.* at ¶ 81. This "strong relationship" with Chinese customs officials, according to one of Bone Safety's manufacturers, was their "unwritten key to success." *Id.* at 82. UPS's procurement department was aware of that allegation in October 2010 but it never investigated the claim—perhaps because UPS's corporate designee testified under oath that he did not know the meaning of "under-the-table," or because, according to UPS's corporate designee, the UPS employee who wrote the email did not "understand everything [she was] writing." *Id.* at ¶ 83. And, even though ING informed UPS that it was illegal to import used RNCs into China (*id.* at ¶ 35), UPS never investigated that claim either or hired legal counsel to offer an opinion. *Id.* at ¶ 84.

## II.   AS A RESULT OF UPS'S BREACH OF CONTRACT, ING HAS SUFFERED SPECIFIC AND QUANTIFIABLE DAMAGES.

ING will establish that it is entitled to damages under Georgia law for UPS's calculated and material breach of the Contract. ING is entitled to lost profits, compensatory damages, and counsel fees. First, ING will prove is entitled to lost profits on new RNCs in the amount of

$2.58 per new RNC for the years 2011-2012.  *See Shaw v. Ruiz*, 428 S.E.2d 98, 102 (Ga. App. 1993).  UPS was obligated to purchase from ING at least 90% of the 624,600 new RNCs in 2011 at a price of $5.08 per new RNC.  ING's per-bag margin equaled $2.58.  Thus, lost profits for 2011 total a minimum of $1,450,321.20.

In 2012, UPS's ordered approximately 1,416,362 new RNCs.  ING is entitled to lost profits in the amount of $2,886,829 for 2012 ($2.58 x 1,118,926 RNCs for 2012, which is 79% of UPS's new RNC orders).

ING also will establish that it is entitled to reliance damages that arise naturally from UPS's material breach of the Contract.  *See* O.C.G.A. § 13-6-9.  Specifically, ING has incurred costs and liabilities associate with setting up operations in Hong Kong for the purpose of repairing used RNCs in the amount of approximately $876,925.  ING also has incurred costs associated with purchasing materials for the manufacture of new RNCs (materials that were not used due to UPS's breach of contract) in the rough amount of $352,222.  UPS's breach also caused ING to breach its agreement with its second-tier supplier, On Right Trading, in the approximate amount of $350,000.

Finally, ING will prove that it is entitled to attorneys' fees as appropriate under Georgia law.  *See Jeff Goolsby Homes Corp v. Smith*, 308 S.E.2d 564, 566 (Ga. App. 1989) ("In contract cases . . . an award of attorney fees is allowable only when they are specially pleaded and the evidence shows not only the reasonable amount of attorney fees incurred, but also that a defendant was guilty of bad faith, stubborn litigiousness, or of causing the plaintiff unnecessary trouble and expense.").  It also will show that it is entitled to pre-judgment interest of 9%, calculated from the date of UPS's breach, consistent with New York law.  *See Nu-Life Contr.*

A

*Corp. v. Bd. of Educ. of City of New York*, 789 F. Supp. 103 (E.D.N.Y. 1992); *see also* N.Y.

C.P.L.R. §§ 5001(a), 5004.

## III.    UPS'S COUNTERCLAIM FOR BREACH OF CONTRACT LACKS MERIT.

Although the parties have yet to receive and analyze Judge Rakoff's opinion granting and

denying in part summary judgment, ING intends to prove that UPS's counterclaim is meritless.

The crux of that claim is that ING breached the Contract by not repairing used RNCs within 30

days.  The facts will show, however, that not only does the plain language of the Contract belie

UPS's claim, but also that in the course of its dealings with UPS and other suppliers, UPS never

insisted on a strict 30-day turnaround.

First, the Contract language only requires reasonable effort to repair damaged RNCs

within the so-called anticipated 30-day turnaround time:  "Supplier will make every reasonable

effort to process the repairs in an efficient, effective and timely manner as possible, with the

anticipated turn around of 30 days, unless otherwise mutually agreed."  (DI 32-10).  ING will

prove, among other things, that the 30-day period applies to "process[ing] the repairs," which

does not include transportation time and logistics issues that are handled by UPS's affiliate, UPS

Supply Chain Solutions.

Second, ING will present other evidence that the alleged 30-day turnaround time UPS

purports to enforce in this case:  (1) was never previously enforced with the repair supplier, who

testified that repairs were turned around in 90-120 days; (2) UPS's own actions prevented ING

from complying with the 30-day period, even assuming it includes transportation time and

logistics; and (3) UPS's own understanding of how long it took to load and transport used RNCs

to and from Illinois belies any suggestion that UPS could have understood the 2011 Price

Schedule to require a 30-day turnaround.

Third, as ING argued on summary judgment, UPS materially breached the Contract by failing to purchase a "majority" of new RNCs from ING in 2011.   Under Georgia law, that material breach relieved ING of its obligation to perform repair work.  *See* Ga. Code Ann. § 11-2-610 ("When either party repudiates the contract with respect to performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may: (c) . . . suspend his own performance . . .); *see also* Ga. Code Ann. § 13-4-23 ("If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance."); *Jinright v. Russell*, 182 S.E.2d 328, 330 (Ga. App. 1971) ("[I]t is the general rule that all conditions in a contract must be fulfilled except when performance is excused.  For example, when it is made apparent to one party that the other party will not carry out its obligations even if all conditions were to be performed, then such performance is excused.").

## CONCLUSION

ING will prove that it had a binding, enforceable Contract with UPS that obligated UPS to provide ING with a majority of orders for new RNCs, additional quantities of RNCs at an agreed-to price, and all damaged RNCs for ING to repair.   UPS breached those obligations resulting in substantial damages to ING.

Dated: September 24, 2012

Respectfully submitted,

**PATTON BOGGS LLP**

By:  _Ugo Colella for_

Ugo Colella (admitted *pro hac vice*)
John J. Zefutie, Jr. (JZ-9419)
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102-0301
(973) 848-5600
-and-
2550 M Street, N.W., 7th Floor
Washington, D.C. 20037
Phone:  (202) 457-6620
ucolella@pattonboggs.com
jzefutie@pattonboggs.com

*Attorneys for Plaintiff*
*ING Global*

## CERTIFICATE OF SERVICE

JOHN J. ZEFUTIE, JR. certifies as follows:

      1.    I am an attorney at law admitted to the Bar of this Court and an associate at the law firm of Patton Boggs LLP.  Patton Boggs is counsel for Plaintiff ING Global ("ING") in the above-captioned action.

      2.    On September 24, 2012, I caused ING's Trial Brief to be electronically filed with the clerk of the court via ECF, which, pursuant to Local Rule 5.2, is deemed served for purposes of Fed. R. Civ. P. 5 on the following counsel:

>Robert E. Kaelin, Esq.
>Murtha Cullina, LLP
>CityPlace I-185 Asylum Street
>Hartford, Connecticut 06103
>*Attorneys for Defendant*
>*United Parcel Service Oasis Supply Corporation*

      I certify under penalty of perjury that the foregoing is true and correct.  Executed on this 24th day of September, 2012.

>*s/ John J. Zefutie, Jr.*
>John J. Zefutie, Jr.