UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ING GLOBAL, | ) | Case No. 11-cv-5697(SC) |
|  | ) |  |
|  | ) | ORDER GRANTING MOTION TO |
| Plaintiff, | ) | SET ASIDE AWARD OF ATTORNEY |
|  | ) | FEES AND DENYING MOTION TO |
| v. | ) | SET ATTORNEY FEES |
|  | ) |  |
| UNITED PARCEL SERVICE OASIS SUPPLY | ) |  |
| CORPORATION, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |
| UNITED PARCEL SERVICE OASIS SUPPLY | ) |  |
| CORPORATION, | ) |  |
|  | ) |  |
| Counter-Claimant, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ING GLOBAL, | ) |  |
|  | ) |  |
| Counter-Defendant. | ) |  |
|  | ) |  |

## I.   **INTRODUCTION**

The above-captioned matter arises out of a dispute between Plaintiff ING Global ("ING") and Defendant United Parcel Service Oasis Supply Corporation ("UPS Oasis") over a contract for the supply and repair of Reusable Network Containers ("RNC(s)"). The Court held a six-day jury trial from October 3 through October 12, 2012.  The jury found in favor of ING on its claim for breach of contract and awarded ING $1,713,762 in damages.

ECF No. 117 ("Verdict").  The jury also found that ING was entitled to attorney fees.  Id.  ING now moves to set attorney fees at approximately $2 million.  ECF No. 124.  UPS Oasis moves, pursuant to Rule 59 of the Federal Rules of Civil Procedure, to set aside the award of attorney fees or, in the alternative, for a new trial on the issue of attorney fees.  ECF No. 139 ("Mot.").  UPS Oasis's Rule 59 motion is fully briefed, ECF Nos. 155 ("Opp'n"); 159 ("Reply"), as is ING's motion to set attorney fees, ECF Nos. 131, 135.  The Court finds these matters appropriate for resolution without oral argument.  For the reasons set forth below, the Court GRANTS UPS Oasis's Rule 59 Motion and SETS ASIDE the award of attorney fees.  ING's motion to set attorney fees is DENIED as moot.

## II.  BACKGROUND

UPS Oasis is in the business of purchasing various services, supplies, and equipment for United Parcel Service ("UPS"), including RNCs.  Tr. at 487.[1]  An RNC "is a mesh type bag used by UPS internally to consolidate numerous small packages into one bag to reduce the number of handlings in the UPS sorting and transportation system."  ECF No. 100 (Summary Judgment Order ("SJ Order")) at 3 n.1.  Between 2007 and 2009, ING and its predecessor-in-interest, Nira, Inc., entered into short-term contracts to supply new RNCs to UPS Oasis.  Id. at 3;

---

[1] Six consecutively paginated trial transcripts were filed with the Court.  ECF Nos. 141 (pp. 1-135), 143 (pp. 136-353), 145 (pp. 354-461), 147 (pp. 462-655), 149 (pp. 656-860), 151 (pp. 861-960) (hereinafter, Transcript ("Tr.") at ___.)

Tr. at 41-51.  In March 2010, UPS Oasis issued a request for proposals ("RFP") to ING and other vendors, soliciting bids to become a supplier of new and repaired RNCs.  SJ Order at 3. According to the RFP, UPS Oasis's intent was to identify a "primary supplier" who would be awarded at least 50 percent of the volume of new RNCs.  Id. at 3-4.  The remaining volume of new RNCs would be awarded to one or two other suppliers.  Id. at 4.  The primary supplier was also to be responsible for repairing UPS Oasis's damaged RNCs.  Id. at 3-4.

ING submitted a bid and, after a multi-round bid process, eventually secured a three-year contract to supply new RNCs and repair UPS Oasis's damaged RNCs.  Id. at 4.  The agreement between ING and UPS Oasis was memorialized in 2010 in a Master Purchase of Goods Agreement (the "Master Agreement") and a price schedule.  Trial Exs. 116 ("2010 Price Schedule"), 117 ("Master Agr.").  According to the 2010 Price Schedule, "1,200,000 total RNCs are estimated to be purchased during a three (3) year period" and "[t]he Award of Repairs aligns with the supplier receiving a majority of the order for new RNCs."  2010 Price Schedule at 2.  The parties agree that ING was to conduct the repair work, though they dispute whether ING was to receive the majority of UPS Oasis's annual requirements or merely the amount of RNCs specified in the 2010 Price Schedule.  See Tr. at 12, 25.  They also dispute whether the term "majority" means 50 percent plus one or something more.  See id. at 25, 100.  At trial, ING suggested that majority meant as much as 80 to 90 percent.  Id. at 100.

At the time the parties entered into the 2010 Price
Schedule and the Master Agreement, they understood that damaged
RNCs would be imported into China for repairs.  Tr. at 58; ECF
No. 48 ("UPS Rule 56.1(a) Statement") ¶ 34.  Initially, ING did
not repair any RNCs for UPS Oasis due, at least in part, to
problems with Chinese customs.  Sometime after the 2010 Price
Schedule was executed, ING learned that the Chinese authorities
would not allow the importation of damaged RNCs into China.  Tr.
at 113.  As a result, the parties agreed to move the repair
operations to Hong Kong and executed a revised Price Schedule
(hereinafter, the "2011 Price Schedule"), which reflected the
changes in repair pricing resulting from the move.[2]  See ECF No.
32 (First Amended Complaint ("FAC")) ¶¶ 81-82; UPS Rule 56.1(a)
Statement ¶ 44; Trial Ex. 326 ("2011 Price Schedule").  The 2011
Price Schedule provides: "This Price Schedule . . . replaces
[the 2010 Price Schedule] in its entirety due to changes in the
RNC Repair Process and Pricing."  2011 Price Schedule at 1.
Like the 2010 Price Schedule, the 2011 Price Schedule provides
that 1.2 million RNCs are estimated to be purchased during the
contract's three-year term.  Id. at 2.  During the term of the
Agreements, UPS Oasis sent a number of damaged RNCs for repair
to one of ING's competitors, Bone Safety Signs, LLC ("Bone
Safety"), for repair.

In August 2011, UPS Oasis informed ING that it had
identified a "previously unexpected" need for an additional

---

[2] Hereinafter, the Court refers to the 2010 Price Schedule, 2011
Price Schedule, and the Master Agreement, collectively, as the
"Agreements."

624,629 new RNCs for the year 2011.  SJ Order at 5; Tr. at 606.
Rather than order these additional RNCs from ING at the price
set forth in the 2011 Price Schedule, UPS Oasis asked ING and a
number of other suppliers to bid for them.  See Tr. at 611.
Nira Soomekh, ING's president, expressed concerns to UPS Oasis
that, pursuant to the Agreements, the majority of the additional
624,629 RNCs should have been awarded to ING.  See id. at 632.
On August 2, 2011, Doug Vollenweider, a UPS procurement
specialist, emailed Ms. Soomekh, stating: "As per our
conversation, the agreement states the total quantity of RNCs
for the three year agreement awarded ING Global is estimated at
1.2 [million].  UPS is not obligated to purchase 1.2 [million]
RNCs or any additional RNCs above that amount from ING Global."
ECF No. 156-7.  On August 5, 2011, UPS Oasis informed ING of its
decision to award the additional 624,629 RNCs to Bone Safety.
ECF No. 48-3.

On July 5, 2011, about one month before UPS Oasis awarded
the additional 624,629 RNCs to Bone Safety, ING picked up 10
trailers of used RNCs to ship to Hong Kong for repair.  SJ Order
at 5.  On August 10, 2011, UPS emailed ING requesting
information about the status of the RNC repairs.  Id.  ING
responded that it had "concluded that UPS has breached our
contract."  Id.

ING filed the instant action against UPS Oasis and Bone
Safety on August 16, 2011, and the case was initially assigned
to the Honorable Jed. S. Rakoff.  ECF No. 1.  In its FAC, ING
asserted claims for breach of contract and fraud against UPS and

tortious interference and unfair competition against Bone
Safety. FAC ¶ 102. The crux of ING's breach of contract claim
was that UPS Oasis materially breached the 2010 and 2011 Price
Schedules in two ways: (1) by awarding the 624,629 additional
RNCs to Bone Safety and (2) by sending Bone Safety its RNC
repair business. Id. ¶ 102. ING's fraud claim was premised on
allegations that UPS Oasis misrepresented that the 2010 bid
process would consist of one round of bidding and also
misrepresented that it intended to find a majority supplier for
new RNCs. Id. ¶ 106. In answering the FAC, UPS Oasis filed two
counterclaims, the first for breach of contract for failure to
repair used RNCs and the second for a breach of a
confidentiality agreement. ECF No. 33 ("Answer") at 25-26.

The parties later filed cross motions for summary judgment.
ECF Nos. 41, 43, 44. In ruling on these motions, Judge Rakoff
dismissed ING's fraud claim against UPS Oasis on the ground that
"ING was necessarily aware that it was not involved with a
single-round bidding process" when it submitted a second-round
bid. SJ Order at 18. The Court also rejected ING's claim that,
"when UPS Oasis said that it intended to find a majority
supplier, it never actually intended to do so." Id. at 20.
The Court reasoned that such a statement could not support a
claim for fraud since it was a statement about future events,
not present fact. Id. Additionally, the Court dismissed all
claims against Bone Safety and UPS Oasis's counterclaim for
breach of a confidentiality agreement. Id. at 23.

ING's claim for breach of contract and UPS Oasis's first counterclaim for breach of contract were allowed to proceed to trial.  The Court found ambiguous the provision in the Price Schedules stating that "[t]he award of the Repairs aligns with the supplier receiving a majority of the order for new RNCs." Id. at 9.  Among other things, the Court found that there was a genuine dispute of material fact as to (1) whether the term "majority" applied on a per-year or three-year basis; (2) whether UPS Oasis was on pace to purchase a majority of the new RNCs that it required during the three-year period; (3) whether the additional 624,629 RNCs were "unreasonably disproportionate" to the stated estimate in the Price Schedules and, accordingly, whether UPS Oasis was required to order those RNCs from ING; and (4) whether ING was awarded the exclusive right to repair UPS Oasis's used RNCs.  Id. at 9-10, 13.

On September 11, 2012, the case was transferred to the undersigned for trial.  ECF No. 75.  The parties presented their cases to the jury from October 3 through October 12, 2012. Among other things, the Court instructed the jury that it could find UPS Oasis liable for ING's attorney fees "if it determined that UPS Oasis acted in bad faith in its underlying conduct, which forms the basis for ING's lawsuit."  ECF No. 116 ("Jury Instruction") No. 32.  The jury ultimately found for ING on its claim for breach of contract and against UPS Oasis on its counterclaim.  Verdict.  The jury also found that ING was entitled to $1,713,762 in compensatory damages, as well as attorney fees.  Id.

III. <u>**LEGAL STANDARD**</u>

UPS Oasis moves to alter or amend the judgment to set aside the attorney fee award under Rule 59(e) and, in the alternative, moves for a new trial under Rule 59(a).  Mot. at 2-3.  "Although Rule 59(e) does not prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment, . . . district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice." <u>Munafo v. Metro. Transp. Auth.</u>, 381 F.3d 99, 105 (2d Cir. 2004) (quotations omitted).  Likewise, "for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence."  <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 245 (2d Cir. 2003) (quotations omitted).  "A jury's credibility assessments are entitled to deference, and . . . [w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  <u>United States v. Landau</u>, 155 F.3d 93, 104-05 (2d Cir. 1998) (citations and quotations omitted).  "However, these principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice." <u>Id.</u> (quotations omitted).

///

///

## IV.  **DISCUSSION**

Both parties agree that Georgia law governs the instant dispute.  See Mot. at 3; Opp'n at 12.  The Georgia Code provides that a plaintiff may recover attorney fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble or expense."  Ga. Code. Ann. § 13-6-11.  Georgia case law often refers to two types of bad faith in this context: (1) "frivolous and unfounded denial of liability," Jeff Goolsby Homes Corp. v. Smith, 168 Ga. App. 218, 221 (Ga. Ct. App. 1983), and (2) "sinister motive," Glen Rest., Inc. v. W., 173 Ga. App. 204, 205 (Ga. Ct. App. 1984).

In this case, ING asked the Court to instruct the jury on the variant of bad faith requiring a showing of frivolous and unfounded denial of liability.  ECF No. 114 ("ING Revised Proposed Jury Instructions") at 7.  Under this standard, Georgia courts have held that there is no bad faith where "a bona fide dispute exists[] and . . . defendants had, as a matter of law, a reasonable defense to plaintiffs' claims."  Jeff Goolsby Homes, 168 Ga. App. at 222.  The Court adopted ING's proposed instruction on bad faith, instructing the jury:

> ING seeks attorney's fees for the expense of prosecuting its breach of contract claim against UPS. You the jury may find UPS Oasis liable for ING's attorney's fees for the expense of prosecuting the breach of contract claim, if you determine that UPS Oasis acted in bad faith in its underlying conduct, which forms the basis for ING's lawsuit.
>
> Bad faith does not refer to bad faith in the prosecution of this litigation, but rather to the acts of UPS Oasis in dealing with ING prior to ING's filing of this lawsuit. Bad

> faith means a frivolous and unfounded denial
> of liability. If you find that UPS's actions
> before ING filed this lawsuit were frivolous
> and unfounded, then you must find that UPS
> Oasis acted in bad faith and find UPS Oasis
> liable for ING's attorney's fees. On the
> other hand, if you find that UPS had any
> reasonable ground to contest ING's breach of
> contract claim, then you must find there is
> no bad faith on the part of UPS and not find
> UPS Oasis liable for attorney's fees.

Jury Instruction No. 32.[3]  When the jurors asked for clarification on this instruction, the Court explained that they were to focus on "the conduct of the parties before the action. Any conduct . . . after the action, that is part of . . . legitimate lawyering . . . ."  Tr. at 966.

The jury's request for clarification is understandable. The bad faith standard proposed by ING and ultimately adopted by the Court asked the jury to consider UPS Oasis's conduct prior to the inception of litigation but also focused on whether UPS Oasis had reasonable grounds to contest liability -- grounds which it would not have had a reason to assert until after ING filed suit.  Georgia courts apply the "frivolous and unfounded denial of liability" standard in cases where there are allegations of "[a] refusal to pay in bad faith."  See Jeff Goolsby Homes, 168 Ga. App. at 221 (quoting First Nat. Bank of Atlanta v. Wynne, 149 Ga. App. 811, 818 (Ga. Ct. App. 1979)). The standard was initially articulated and often used in

---

[3] ING later objected to Jury Instruction No. 32, Tr. at 864, even though it is identical to the bad faith instruction that it proposed.  Compare Jury Instruction No. 32 with ING Revised Proposed Jury Instructions at 7.  ING argued that the Court should not have instructed the jury that there could be no bad faith if "UPS had any reasonable ground to contest ING's breach of contract claim."  Id.  The objection was overruled.

insurance cases, where the question presented was whether the insurer had reasonable grounds to deny or contest an insured's claim before the insured filed suit.  See Am. Nat. Ins. Co. v. Holbert, 50 Ga. App. 527, 527 (Ga. Ct. App. 1935); see also Albergotti v. Equitable Life Assur. Soc. of U.S., 48 F. Supp. 290, 291 (S.D. Ga. 1942); Belch v. Gulf Life Ins. Co., 219 Ga. 823, 828 (Ga. 1964); Dependable Ins. Co. v. Gibbs, 218 Ga. 305, 316 (Ga. 1962).

A "frivolous and unfounded denial of liability" standard is hardly the best fit for this case since ING's claims do not flow from an insurance claim or even an alleged refusal to pay. Nevertheless, that is the only theory of bad faith that ING pursued at trial.[4]  Not surprisingly, ING struggles to match the facts of the case to the standard.[5]  ING argues that UPS Oasis's

---

[4] Initially, ING asked the Court to instruct the jury that UPS Oasis could be found liable for attorney fees if ING acted in bad faith, had been stubbornly litigious, or caused ING unnecessary trouble or expense.  ECF No. 90.  However, it later abandoned its claim for attorney fees on the grounds of stubborn litigiousness and unnecessary trouble and expense.  ING Revised Proposed Jury Instructions.  ING never asked for an instruction on "sinister motive."

[5] ING also strains to identify relevant case law.  It repeatedly cites to Jeff Goolsby Homes to explain the "frivolous and unfounded denial of liability" standard.  See Opp'n at 12-13. While Jeff Goolsby Homes mentioned that standard, it never actually applied it.  See 168 Ga. App. at 218.  Further, none of the other Georgia authority cited by ING in support of the "proper framework" for reviewing its request for attorney fees involves the bad faith denial of liability standard ING advanced at trial.  See Opp'n at 12-13 (citing Lay Bros., Inc. v. Golden Pantry Food Stores, Inc., 273 Ga. App. 870, 876 (Ga. Ct. App. 2005); Steel Magnolias Realty, LLC v. Bleakley, 276 Ga. App. 155, 157 (Ga. Ct. App. 2005); Rice v. Lost Mtn. Homeowners Assoc., Inc., 269 Ga. App. 351, 355-56 (Ga. Ct. App. 2004);

bad faith conduct consisted of: (1) giving repair work to Bone
Safety in 2010 and 2011, despite the fact that ING was awarded
the RNC repair contract; (2) breaching the Agreements by
ordering the additional 624,629 RNCs from Bone Safety in the
summer of 2011; and (3) representing that UPS Oasis was not
obligated to purchase any RNCs from ING, even though internal
UPS Oasis emails suggested that the company believed that it did
have purchase obligations.  Opp'n at 5-6.  The fundamental flaw
in ING's reasoning is that none of this conduct amounts to a
denial of liability, let alone an unfounded and frivolous denial
of liability.  The only denials of liability identified by
either party occurred after ING filed suit, and, as ING points
out, post-suit litigation tactics are irrelevant under the bad
faith standard given to the jury.

       To the extent that the denials and affirmative defenses
asserted by UPS Oasis during litigation are relevant, they are
clearly not frivolous or unfounded.  Otherwise the Court would
not have allowed UPS Oasis to present them to the jury.  At
summary judgment, UPS Oasis argued that it was not obligated to
purchase the additional 624,629 RNCs because the amount was
unreasonably disproportionate to the stated estimates in the
Agreements.  ING vigorously contested the issue, but Judge
Rakoff ultimately allowed UPS Oasis to proceed with the defense.
SJ Order at 9-10.  The undersigned affirmed Judge Rakoff's
decision when ruling on the parties' motions in limine.  ECF 112
at 1.  The Court also denied ING's motion in limine to preclude

Formica Corp. v. Rouse, 176 Ga. App. 548, 548 (Ga. Ct. App.
1985)).

UPS Oasis from introducing evidence or argument related to its affirmative defenses to ING's claim for breach of the repair provisions -- specifically, illegality, prevention of performance, mutual mistake, and mutual rescission.  Id. at 2. ING argues that these defenses were not reasonable because the jury clearly rejected them.  Id. at 22.  The Court disagrees. The verdict on ING's breach of contract claim suggests that the jury may have found some of these defenses unavailing.[6]  But an argument can be unavailing and still be reasonable and non-frivolous.

ING also makes much of Mr. Vollenweider's August 2, 2011 email to Ms. Soomekh, in which he stated that "UPS [Oasis] is not obligated to purchase 1.2 [million] RNCs or any additional RNCs above that amount from ING Global."  Opp'n at 5.  ING interprets the email to mean that UPS Oasis believed it "had no purchase obligations whatsoever under the 2011 Price Schedule." Id.  ING contends that the email shows that UPS Oasis's actions were frivolous and unfounded because the email was inconsistent with the terms of the Agreements and also inconsistent with what UPS was saying internally at the time.  Id.  Specifically, ING points to an August 1, 2011 email from Mr. Vollenweider to Mike Rose, Mr. Vollenweider's superior, stating: "UPS [Oasis] is only

---

[6] In fact, it is unclear whether the jury found in favor of ING on its breach of contract claim as it related to RNC repairs. The verdict form did not ask the jury to distinguish between the two aspects of ING's breach of contract claim -- breach of the repair provisions and breach of the provisions related to new RNCs -- and the damages ING sought for its repair claim were minimal compared to the total damages awarded.

obligated to purchase the amounts noted in the contract for each
of the three years." ECF No. 156-9.  ING also argues that the
jury had reason to believe that UPS Oasis's position was
frivolous and unfounded because its own witness, Mr. Rose,
changed his testimony concerning UPS Oasis's purchase
obligations.[7]

But ING fails to explain how Messrs. Vollenweider and
Rose's statements constitute pre-suit denials of liability.  Mr.
Rose's statements were not made until after ING Global filed
suit.  As such, they are irrelevant.  Mr. Vollenweider's
statement was made earlier, but he was not denying liability --
he was merely expressing his interpretation of UPS Oasis's
purchase obligations.  Further, ING's suggestion that Mr.
Vollenwieder or UPS Oasis was attempting to willfully
misrepresent the contract terms and avoid all of UPS Oasis's
obligations under the Agreements is belied by the undisputed
evidence.  Regardless of whether Mr. Vollenweider truly believed
that the Agreements required UPS Oasis to purchase any new RNCs
from ING at the time he sent the August 2 email, the evidence
adduced at trial shows that UPS Oasis did purchase new RNCs from
ING during the term of the contract.  Indeed, it is undisputed
that, by August 2011, UPS Oasis had purchased more new RNCs from
ING than the stated estimates in the Price Schedules.  See Tr.

---

[7] At his deposition, Mr. Rose testified that UPS Oasis was not
obligated to purchase any RNCs from ING.  Tr. at 618-19.  At
trial, Mr. Rose stated that his prior testimony was incorrect
and that, based on subsequent review of the Agreements, he
realized that the 2010 Price Schedule contained a purchase order
which obligated UPS Oasis to purchase a certain amount of RNCs
from ING.  Id. at 618-619, 735.

at 590, 598.  ING contends that the Agreements required UPS
Oasis to purchase substantially more than the estimates, but, as
Judge Rakoff held in the Summary Judgment Order, the Agreements
were ambiguous on this point.  SJ Order at 9-10.  ING cannot
plausibly contend that UPS Oasis took a frivolous or unfounded
position by maintaining that it was only required to purchase
the amounts expressly set forth in the Agreements.[8]

   While ING claims that UPS Oasis engaged in bad faith
through a frivolous and unfounded denial of liability, ING's
arguments are more consistent with a "sinister motive" theory of
bad faith.  As discussed above, ING cannot identify any pre-suit
denials of liability by UPS Oasis, let alone frivolous or
unfounded denials.  Instead ING points to allegedly frivolous or
unfounded conduct.  For example, in its opposition brief, ING
essentially argues that UPS Oasis engaged in bad faith conduct
by willfully misconstruing its purchase obligations under the

_____

[8] ING also argues UPS Oasis took a frivolous and unfounded
position when it claimed that ING waived its right to sue under
the repair provisions of the 2010 Price Schedule by executing
the 2011 Price Schedule.  Opp'n at 4; Tr. at 920-21.  This
argument lacks merit.  First, UPS Oasis did not assert its
waiver defense until after the lawsuit was filed, so it is
unclear how it could possibly constitute "underlying conduct,
which forms the basis for ING's lawsuit."  See Jury Instruction
No. 32.  Second, UPS Oasis's waiver defense is far from
frivolous.  The 2011 Price Schedule provides that it "replaces"
the 2010 Price Schedule "in its entirety," and, under Georgia
law "[a] rescission of contract by consent or a release . . .
shall be a complete defense."  Ga. Code. Ann. § 13-5-7.  To the
extent that ING is suggesting that UPS Oasis tried to "trick"
ING into waiving its rights under the 2010 Price Schedule, see
Tr. at 920, its argument also fails.  Ms. Soomekh testified at
trial that she reviewed and understood the 2011 Price Schedule
before she signed it on behalf of ING.  See Tr. at 128-29, 285-
86.

Agreements and breaching the Agreements from day one.  <u>See</u> Opp'n
at 3-4 ("UPS considered ING to be the primary supplier of new
and repaired RNCs, yet it continued to give used RNCs to [Bone
Safety] . . . and took the position . . . that it was not
obligated purchase any of th[e] new [624,629] RNCs from ING . .
. .").  Likewise, ING could only point to allegedly sinister
conduct in its closing arguments at trial.  Specifically, ING's
counsel argued:

> [Y]ou heard this double talk, this corporate
> double talk, oh, yeah, we had obligations because
> when we issue a purchase order we have
> obligations. But the dirtiest little secret [UPS
> Oasis is] not telling you is, they don't have to
> issue a purchase order if they don't want to or
> delivery schedule if they don't want to. . . . .
> And this is bad faith, this is bad faith. . . .
> That's frivolous, to claim, oh, I don't have to
> buy anything from you, I just did a five-week bid
> process, you became the primary supplier, but I
> don't have to buy anything from you. . . .
>
> Attorneys' fees: I think you've heard me talk
> about bad faith here. What we have here, our bad-
> faith claim is pretty straightforward. [ING is] a
> primary supplier. Ye[t], they keep giving
> [orders] to the incumbent [Bone Safety] and they
> don't tell [ING] . . . .

Tr. at 913, 921.

Under the sinister motive standard, attorney fees may only
be awarded "where the contract was entered into in bad faith by
the defendant in the first instance, or was procured by fraud
and deceit" or where there is "bad faith in carrying out the
provisions of the contract sufficient to support the award."
<u>Glen Rest.</u>, 173 Ga. App. at 205.  Further, under this standard,
"[b]ad faith cannot be prompted by an honest mistake as to one's
rights or duties but must result from some interested or

sinister motive." <u>Metro. Atlanta Rapid Transit Auth. v.</u>
<u>Mitchell</u>, 289 Ga. App. 1, 4 (Ga. Ct. App. 2007).  "Bad faith is
not simply bad judgment or negligence, but it imports a
dishonest purpose or some moral obliquity, and implies conscious
doing of wrong, and means breach of known duty through some
motive of interest or ill will."  <u>Id.</u>

    The jury could not have awarded ING attorney fees under a
sinister motive theory because it was not instructed on that
standard.  Even if it had been, ING could not recover under a
sinister motive theory as a matter of law.  First and foremost,
a finding of sinister motive is precluded by the Court's Summary
Judgment Order.  In that order, the Court rejected ING's
fraudulent inducement claim as well as its argument that UPS
Oasis never intended to make ING its primary supplier of RNCs.
SJ Order at 19-20.  Accordingly, ING cannot now argue that UPS
Oasis entered into the contract in bad faith in the first
instance.  Nor can ING plausibly contend that UPS Oasis's
interpretation of the contracts amounted to conscious wrong-
doing.  At summary judgment, the Court also found that the
Agreements "do not provide unambiguous support for ING's
position that it was awarded exclusivity of repairs" and found
ambiguous the term in the Price Schedules which allegedly gave
ING the right to the "majority" of UPS Oasis's requirements for
new RNCs.  <u>Id.</u> at 9-10, 13.

    ING suggests that a jury could have found sinister motive
because UPS Oasis gave repair work to Bone Safety in 2010 and
2011 despite the exclusivity provisions in the Agreements.

Opp'n at 24-28.  This argument fails for a number of reasons.
First, it conflates breach and bad faith.  See Steel Magnolias,
276 Ga. App. at 157 ("A recovery of OCGA § 13-6-11 attorney's
fees in a contract action must be based upon evidence which
shows more than a mere breach of contract." (quotations
omitted)).  Second, the Court has already found that these
exclusivity provisions are ambiguous.  SJ Order at 13.  UPS
Oasis cannot be held liable for a bad faith breach when the
contracts at issue are amenable to a reasonable interpretation
which supported its position.  Third, the undisputed evidence at
trial showed that, though the parties initially contemplated
that repair work would be performed in China, it later became
evident that importing damaged RNCs into China was illegal.
While the parties disagree about when they discovered the
Chinese law and who was responsible for clearing the damaged
RNCs through customs, it is undisputed that the China-based
repair program initially planned by ING would not work.  At
trial, ING suggested that UPS Oasis should have been aware of
the Chinese law because, among other things, it was responsible
for clearing the damaged RNCs through Chinese customs.  See Tr.
at 106-07.  Even if this were so, any negligence by UPS Oasis in
researching Chinese customs laws cannot support a claim for bad
faith.  See Metro. Atlanta Rapid Transit, 289 Ga. App. at 4.
Fourth, the undisputed evidence shows that ING's prices for
repair work were substantially lower than those offered by its
competitors.  Tr. at 536.  ING's suggestion that UPS Oasis

intentionally breached the Agreements' repair provisions so that it could pay a higher price simply does not make sense.

ING further argues that a finding of sinister motive is supported by Mr. Vollenweider's statements in early August 2011 that UPS Oasis had no obligations under the Agreements.  Opp'n at 31-32.  ING is again conflating breach and bad faith.  The fact that Mr. Vollenwider may have misinterpreted the Agreements is not evidence that UPS Oasis harbored some sinister motive towards ING.  Further, UPS Oasis's actual conduct during 2010 and 2011 suggests that it did believe that it had purchase obligations under the Agreements.  As discussed above, in 2010 and 2011, UPS Oasis purchased more RNCs than the stated estimates in the Agreements.

Further, if UPS Oasis had wished to avoid its purchase obligations entirely, it could have formally terminated the Agreements at any time and for any reason.  The Master Agreement provides: "[UPS Oasis] may terminate a Price Schedule or this Agreement for any reason upon thirty (30) days written notice to [ING]."  Master Agreement § 5 (emphasis added).  ING's suggestion that UPS Oasis knew that it had purchase obligations under the Agreements but recklessly disregarded those obligations is implausible.  If UPS Oasis had wanted to cut out ING, it could have terminated the Agreements upon thirty-days notice and incurred no liability.  Instead, UPS Oasis continued to purchase new RNCs through 2010 and 2011 and did not attempt to terminate the Agreements until after ING filed suit.

In sum, the undisputed evidence shows that the jury's award of attorney fees was clearly erroneous and ING's claims for attorney fees fail as a matter of law under any standard of bad faith.  Accordingly, to prevent manifest justice, the Court must either set aside the attorney fee award or, alternatively, grant UPS Oasis's motion for a new trial.  ING argues that UPS Oasis waived its right to set aside the attorney fee award when it declined to move for a directed verdict at trial.  Opp'n at 7.  Under Rule 50(b), a party moving for judgment notwithstanding the verdict ("JNOV") -- which UPS Oasis is effectively doing here -- must normally first move for a directed verdict during trial.[9]  Baskin, 807 F.2d at 1130.  The purpose of requiring a prior motion for a directed verdict "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury."  Id. at 1134 (internal quotations omitted).  A district court may enter a JNOV absent a prior motion for a directed verdict where "a new trial could not result in a verdict in favor of the non-moving party, as when, for example, the defendant has immunity from a claim for the type of damages sought."  See id.

In this case, UPS Oasis declined to move for a directed verdict at trial and ING's claim for attorney fees is not barred

---

[9] While UPS Oasis moves under Rule 59(e), not Rule 50(b), the standards for granting motions under both rules are the same. Compare Baskin v. Hawley, 807 F.2d 1120, 1130 (2d Cir. 1986) (court may entertain a Rule 50(b) motion for JNOV on grounds other than those raised on a motion for directed verdict "to prevent a 'manifest injustice'") with Munafo, 381 F.3d at 105 (court may grant Rule 59(e) motion to alter or amend the judgment to "prevent manifest injustice").

by some mechanical operation of law.  Nevertheless, the Court
finds that setting aside the verdict (as opposed to granting a
new trial) is the appropriate remedy here.  As discussed above,
ING cannot possibly succeed on a theory of bad faith refusal to
pay -- the only theory of bad faith it advanced at trial --
because this case does not involve a refusal to pay or a pre-
suit denial of liability.  Under the law of the case, ING could
not have succeeded on any of the other relevant theories of bad
faith since the Agreements were ambiguous and UPS Oasis asserted
legitimate defenses at trial.  Further, ING did not bring a
separate claim for bad faith and, thus, the Court could have
properly disposed of the issue on a motion in limine before
trial.  See ECF No. 99.  Accordingly, granting a new trial on
attorney fees could not result in a verdict in favor of ING and
would be a waste of judicial resources.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant
United Parcel Service Oasis Supply Corporation's Rule 59 Motion.
The jury's award of attorney fees is hereby SET ASIDE.
Plaintiff ING Global's motion to set attorney fees is DENIED as
moot.


IT IS SO ORDERED.

Dated:  January 8, 2013

_____
UNITED STATES DISTRICT JUDGE